1999 UT 89

**Daniel E. DIXON, Plaintiff, Counterdefendant, and Appellant,**

v.

**PRO IMAGE INC., a Utah corporation, Transition Sports, Inc., a Utah corporation, and Rentrak Corporation, an Oregon corporation, Defendants, Counterclaimants, and Appellees.**

**No. 981661.**

Supreme Court of Utah.

Sept. 14, 1999.

Earl Jay Peck, D. Scott Crook, Salt Lake City, for plaintiff.

Matthew L. Lalli, Salt Lake City, for defendants.

RUSSON, Justice.

¶ 1 Plaintiff Daniel E. Dixon appeals from the district court's grant of partial summary judgment in favor of defendants Pro Image Inc., Transition Sports Inc., and Rentrak Corporation. Dixon filed suit against defendants, alleging various breaches of both a consulting agreement and an employment agreement and asserting that defendants wrongfully terminated him. Defendants moved for partial summary judgment, arguing that certain of Dixon's claims failed as a matter of law. The district court granted the motion. We affirm in part and reverse in part.

### FACTS

¶ 2 In early 1996, Rentrak Corporation became concerned about the financial well-being of its subsidiary, Pro Image Inc., a sports apparel retail company and franchisor. Rentrak decided to either sell Pro Image or consummate a "spin-off" transaction in which Pro Image stock would be distributed to Rentrak shareholders as dividends. To accomplish either objective, Rentrak believed it needed to improve the financial performance of Pro Image. With that aim, on May 1, 1996, Rentrak entered into both a "Consulting Agreement" and an "Employment Agreement" with plaintiff Daniel E. Dixon.

¶ 3 Under the consulting agreement, Dixon agreed to provide consulting services to Pro Image for a period of two months in exchange for $5,000 per month. As additional consideration, Dixon received an option, exercisable within five years, to purchase 25,000 shares of Rentrak common stock.

¶ 4 On July 1, 1996, the consulting agreement expired and Rentrak activated the employment agreement, thereby installing Dixon as president of Pro Image. The employment agreement stated that Dixon would be employed until October 31, 1996, or until otherwise terminated. It guaranteed Dixon a base salary of nearly $12,000 per month and provided that if, during his employment, Rentrak entered into a "definitive agreement" to sell Pro Image, he would also be entitled to a "Sale Bonus" equal to the greater of $50,000 or one percent of the net sale proceeds.

¶ 5 Dixon functioned as president of Pro Image until December 3, 1996, on which date Rentrak informed him that he would no longer be employed by Pro Image. The following day, pursuant to the employment agreement, Dixon received $9,333.33, which represented the first of six monthly installments comprising Dixon's severance pay.

¶ 6 Prior to the date Dixon took over as president, Pro Image consisted of approximately 63 corporate stores and 175 franchise stores. When Dixon's employment was terminated on December 3, 1996, Pro Image still consisted of 39 corporate stores and 155 franchise stores, having sold one corporate store and 18 franchise stores in October of that year and 7 more corporate stores in

November.[1]  On December 6, 1996, three days after Dixon's employment was terminated, Rentrak executed an asset purchase agreement whereby a group of former and then-current employees of Pro Image known as "P.I. Acquisitions" purchased the remaining 155 franchise stores of Pro Image.

¶ 7 In a letter dated January 13, 1997, Dixon formally demanded payment of the sale bonus under the employment agreement. Dixon contended that although a sale of the entire Pro Image business had not been consummated while he served as president, he was nevertheless entitled to the sale bonus by virtue of the sales and agreements to sell that occurred during his employment.  Rentrak, however, refused to pay Dixon the sale bonus.

¶ 8 On or about March 19, 1997, Dixon attempted to exercise the stock option pursuant to the consulting agreement.  Rentrak responded that Dixon could purchase only restricted stock, not freely tradeable stock. Dixon contested Rentrak's interpretation of the consulting agreement on this point.  Because of this dispute, Dixon did not tender payment for stock and Rentrak did not deliver any stock.

¶ 9 Dixon thereafter filed suit against Pro Image, Transition Sports (a successor-in-interest to Pro Image), and Rentrak (collectively, "Rentrak").  Dixon alleged that Rentrak (1) breached the employment agreement by not paying him the sale bonus, (2) wrongfully terminated his employment in order to avoid paying him the sale bonus, which he had already earned, (3) was unjustly enriched by not paying the sale bonus, (4) breached the consulting agreement by not allowing him to exercise the stock option for freely tradeable stock, which he would have bought and immediately resold at a profit, and (5) owed him the final installment of his severance pay.  As an alternative to his claim for monetary damages concerning the stock option, Dixon requested an order of specific performance requiring Rentrak to issue him unrestricted stock at the price stated in the consulting agreement.

¶ 10 At the close of discovery, Rentrak moved for partial summary judgment.  Rentrak contended that Dixon's claims for breach of the employment agreement and unjust enrichment failed because, as a matter of law, Dixon was not entitled to the sale bonus. Rentrak asserted that the sale bonus provision unambiguously required a single sale of the entire Pro Image business rather than various sales of only some of the Pro Image stores, as occurred during Dixon's employment.  Rentrak further argued that Dixon's claim of wrongful termination failed because, at the time his employment was terminated, he was an at-will employee who could be discharged for any reason or no reason.  Finally, Rentrak contended that Dixon's claim for monetary damages with respect to the stock option failed because such stock options are presumed to be for restricted stock, which cannot be resold for at least one year; consequently, Dixon could not sue for profits he allegedly would have earned by exercising the stock option in March of 1997 at the contract price and immediately reselling the stock at the then-existing market value.

¶ 11 The district court agreed with each of Rentrak's arguments and, accordingly, granted Rentrak's motion for partial summary judgment.  The court thereafter entered final judgment on its rulings pursuant to rule 54(b) of the Utah Rules of Civil Procedure.[2] This appeal followed.

## STANDARD OF REVIEW

¶ 12 Summary judgment is appropriate only if there is no genuine issue concerning any material fact of the case and the moving party is entitled to judgment as a matter of law.  *See* Utah R. Civ. P. 56(c); *S.W. Energy Corp. v. Continental Ins. Co.,* 974 P.2d 1239, 1242 (Utah 1999).  "[I]n reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Higgins v. Salt Lake County,* 855

---

1.  The parties have not explained what happened with the 16 corporate stores and 2 franchise stores not accounted for by the numbers indicated.

2.  Dixon's claims for relief that were not dismissed by the partial summary judgment remain pending before the district court, as well as certain counterclaims filed by Rentrak.

P.2d 231, 233 (Utah 1993). Here, we must determine whether the district court erred in concluding that under the facts of this case, Dixon, as a matter of law, (1) was not entitled to the sale bonus, (2) had no cause of action for wrongful termination, and (3) could exercise his stock option only by purchasing restricted stock from Rentrak. We review these conclusions for correctness, affording no deference to the district court. *See id.* at 235.

## DISCUSSION

### I.  SALE BONUS

█ ¶ 13 Whether Dixon is entitled to the sale bonus under the employment agreement is a matter of contract interpretation. "In interpreting a contract, the intentions of the parties are controlling." *Winegar v. Froerer Corp.,* 813 P.2d 104, 108 (Utah 1991). If the contract is written and the language employed is not ambiguous, the parties' intentions are determined from the plain meaning of the language. *See id.*

█ ¶ 14 Whether contract language is ambiguous is a question of law. *See Willard Pease Oil & Gas Co. v. Pioneer Oil & Gas Co.,* 899 P.2d 766, 770 (Utah 1995). An ambiguity exists where the language " 'is reasonably capable of being understood in more than one sense.' " *R & R Energies v. Mother Earth Indus., Inc.,* 936 P.2d 1068, 1074 (Utah 1997) (quoting *Black's Law Dictionary* 73 (5th ed.1979)). "[W]hen a contract provision is ambiguous ... extrinsic evidence is admissible to explain the intent of the parties." *Willard Pease,* 899 P.2d at 770; *see also Interwest Constr. v. Palmer,* 923 P.2d 1350, 1359 (Utah 1996). If a contract is unambiguous, however, "a court may interpret [it] as a matter of law." *Willard Pease,* 899 P.2d at 770. In so doing, a court must attempt to construe the contract so as to "harmonize and give effect to all of [its] provisions." *Nielsen v. O'Reilly,* 848 P.2d 664, 665 (Utah 1993); *see also Willard Pease,* 899 P.2d at 770 (noting that each contract

provision should be considered in relation to all others).

¶ 15 Here, the sale bonus provision of the employment agreement states:

> [I]f during the Term of this Agreement Rentrak or [Pro Image], as the case may be, enters into a definitive agreement with respect to a Sale, then [Dixon] shall be entitled to a bonus (the "Sale Bonus") equal to the greater of (x) Fifty Thousand Dollars ($50,000) or (y) one percent (1%) of the net sale proceeds....

This language provides that Dixon is entitled to a "Sale Bonus" if, during the "Term" of the agreement, Rentrak or Pro Image entered into a definitive agreement with respect to a "Sale."

¶ 16 The employment agreement defines its "Term" as follows: "Employment shall commence on the date hereof and shall end on October 31, 1996 (the 'End Date') or until [Dixon's] employment under this Agreement is terminated pursuant to this Section 2 (the 'Term')." Thus, the "Term" of the agreement spanned from May 1, 1996, until December 3, 1996, the date on which Dixon's employment was terminated.[3] If a "Sale" occurred during this period, Dixon is entitled to the sale bonus.

¶ 17 The word "Sale," however, is less straightforward and is the center of the parties' dispute concerning the sale bonus. The employment agreement defines "Sale" as

> a definitive agreement to sell [Pro Image], a controlling interest in [Pro Image] or the business of [Pro Image] (whether by asset sale, stock sale, merger, consolidation or otherwise, and in each case a "Sale") to its management or an independent third party purchaser (in each instance, a "Buyer")....

(Parentheses in original.) Hence, a "Sale" occurred if Rentrak entered into a "definitive agreement" to sell (1) Pro Image, (2) a controlling interest in Pro Image, or (3) the business of Pro Image in the enumerated ways "or otherwise."

---

**3.** Although the employment agreement was not activated until July 1, 1996, it does not matter whether the "Term" of the agreement began on that date or on the date the agreement was executed (May 1, 1996) because the parties do not contend that anything relevant to the sale bonus occurred during the interim of these two dates.

¶ 18 Dixon relies primarily on the third definition of "Sale" in contending that he is entitled to the sale bonus. He argues that use of the words "or otherwise" in describing how a "Sale" of the Pro Image business may occur allows for the sale of individual stores or portions of the business, not just a single sale of the entire business as the district court found. Thus, he contends, when 18 franchise stores and 8 corporate stores were sold during October and November of 1996—while he was still employed as president of the company—for a combined total of over $1.6 million, he became entitled to the $50,000 sale bonus.

¶ 19 In support of his position, Dixon notes that the amount of the sale bonus is $50,000 or one percent of the net sale proceeds, whichever is greater. Dixon reasons that because one percent of any sale proceeds of less than $5 million would result in less than $50,000, the parties must have contemplated sale · proceeds of less than $5 million; and since Pro Image had over $13.6 million in assets prior to execution of the employment agreement, it can reasonably be inferred that the parties considered liquidating the business in a piecemeal fashion.

¶ 20 Dixon further argues that the district court's interpretation of the sale bonus provision ignores the underlying purpose of the provision. Dixon explains that the sale bonus was provided as an incentive for him to keep Pro Image afloat, preserving and enhancing its financial appeal to prospective buyers. Dixon submits that under the district court's decision, however, even if the entire business had been sold while he was employed, but in two different transactions, he would not be entitled to the sale bonus despite the fact that his performance in preserving the company would have been the same had the entire business been sold in one transaction. Dixon concludes that the district court therefore erred in ruling that the sale bonus provision required a single sale of the whole company.

¶ 21 Finally, Dixon points out that under the employment agreement, a "Sale" is defined as a "definitive agreement to sell." Dixon contends that a "definitive agreement" had been entered into between Rentrak and P.I. Acquisitions to sell the remaining franchise stores of Pro Image as of the date his employment was terminated, December 3, 1996. Dixon postulates that although the asset purchase agreement consummating that transaction was not executed until December 6, 1996, the parties to that sale had agreed upon all the key terms beforehand, and Rentrak simply postponed execution of the deal to avoid paying him the sale bonus. In support of his· position, Dixon relies on evidence that in November of 1996, during the week prior to Thanksgiving, a representative of Rentrak informed him that an agreement had been reached to sell the remaining franchise stores to P.I. Acquisitions. Dixon calculates that given the combined prices for which all of Pro Image's various assets were eventually liquidated, approximately 58 percent of the value of Pro Image's assets, or a majority of the business, had either been sold or was under agreement to be sold by the date his employment ended. Thus, Dixon argues, even if he is not entitled to the sale bonus by virtue of the sales that were actually completed during his employment, those sales coupled with the "definitive agreement" that had been reached (but not formally executed) to sell the remaining franchise stores necessarily entitle him to the sale bonus.

¶ 22 Rentrak responds that under the plain meaning of the employment agreement, the sale bonus is triggered only by a single sale of the entire Pro Image business. Rentrak points out that the agreement speaks of a "Sale" in the singular, not the plural, refers to "a definitive agreement" to sell Pro Image rather than multiple agreements, and states that the sale bonus will be paid "on the closing date relating to the Sale," not on different closing dates of distinct sales.

¶ 23 Rentrak also argues that certain provisions of the employment agreement cannot be harmonized under Dixon's interpretation. Rentrak points to a provision stating that "following a Sale, [Dixon's] employment may [be] terminated by a Buyer at any time without cause upon ten (10) days['] written notice to [Dixon]." Rentrak explains that under Dixon's theory that the parties contemplated partial sales of the business to

various buyers, whenever such a sale occurred, as in October of 1996 when one corporate store was sold, the buyer would have been authorized to terminate Dixon's employment as president of Pro Image. Rentrak also identifies a provision stating that "[Pro Image] may assign its rights under this Agreement ... to any Buyer in a Sale." Rentrak argues that under Dixon's theory, this provision would have allowed Pro Image to assign Dixon's employment agreement to the buyer of the first Pro Image store. Rentrak contends that such results are contrary to what the parties reasonably could have contemplated in entering into the employment agreement and, as a result, Dixon's proposed interpretation of the sale bonus provision must be rejected.

¶ 24 Rentrak finally asserts that Dixon, by accepting the severance pay, acknowledged that there had been no sale during his employment and that he was not entitled to the sale bonus. According to Rentrak, the parties anticipated that if a sale of the entire business occurred, the buyer would replace Dixon with a new president and Dixon's only compensation in addition to his salary would be the sale bonus. If, on the other hand, such a sale did not occur and Dixon's employment was not renewed, Dixon would be entitled to the severance pay. Rentrak contends that Dixon's acceptance of the severance pay precludes him from seeking the sale bonus as well.

¶ 25 The parties' arguments highlight the ambiguities that should have prevented the district court from granting summary judgment against Dixon on his claims concerning the sale bonus. The parties have presented contrary, tenable interpretations. *See Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990) (noting that ambiguity exists where contrary positions are tenable). It is unclear from the language of the employment agreement whether the parties intended the sale bonus to apply only in the event of a single, completed sale of the entire Pro Image business, as the district court found.

¶ 26 Indeed, the language of the employment agreement indicates that the parties contemplated a "Sale" to consist of less than the entire company. The agreement states that a "Sale" is "a definitive agreement to sell [Pro Image], *a controlling interest* in [Pro Image] or the business of [Pro Image]." (Emphasis added.) The agreement does not define "controlling interest." However, in certain contexts, the term "controlling interest" means less than a totality of a business's assets. In corporate law, for instance, a "controlling interest" references dominant ownership of a corporation's stock, not necessarily all of the stock. *See, e.g., Zetlin v. Hanson Holdings, Inc.*, 48 N.Y.2d 684, 421 N.Y.S.2d 877, 397 N.E.2d 387, 388 (1979) (describing purchase of "controlling interest" as acquisition of dominant ownership of corporation); *Perlman v. Feldmann*, 219 F.2d 173, 174–75 (2d Cir.1955) (same); 18A Am.Jur.2d *Corporations* §§ 762–63, 795 (1985) (same); *see also* Joshua Ronen, *Sale of Controlling Interest: A Financial Economic Analysis of the Governing Law in the United States and Canada*, 37 Case. W. Res. L.Rev. 1, n.1 (1986) (noting that controlling interest "does not depend upon the ownership of any specific percentage of shares and may be highly factual"). Given the parties' use of the term "controlling interest," a reasonable inference exists that a "Sale" of less than the entire Pro Image business would have entitled Dixon to the sale bonus. Thus, extrinsic evidence is necessary to determine what the parties intended a "Sale" triggering the sale bonus to be.

¶ 27 On remand, it must also be determined whether Rentrak and P.I. Acquisitions had reached a "definitive agreement" concerning the sale of the remaining franchise stores to P.I. Acquisitions as of December 3, 1996, the date Dixon's employment was terminated. Under the employment agreement, a "Sale" is defined as a "definitive agreement to sell." What the parties intended by the phrase "definitive agreement to sell" and whether Rentrak and P.I. Acquisitions had reached such an agreement are factual issues. Dixon's entitlement to the sale bonus must be assessed in light of the sales that had been completed as of December 3, 1996, as well as whatever definitive agreements to sell, if any, had been reached

as of that date. If Dixon ultimately is entitled to the sale bonus, it must be determined whether the parties intended the sale bonus and severance pay to be mutually exclusive.

## II. WRONGFUL TERMINATION

■ ¶ 28 Dixon contends that Rentrak wrongfully terminated his employment to avoid paying him the sale bonus. Dixon's claim in this respect presumes he had become entitled to the sale bonus before his employment ended, which, as discussed, is currently unclear. Irrespective of that determination, however, Dixon does not have a cause of action for wrongful termination.

¶ 29 The parties do not dispute that at the time Dixon's employment was terminated, he was an at-will employee—his stated period of employment had ended on October 31, and his employment continued thereafter on an at-will basis. "An at-will employment arrangement allows either the employer or the employee to terminate the employment for any reason, or no reason at all, at any time." *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 400 (Utah 1998). Dixon submits that despite his at-will employment status, Rentrak's termination of his employment was unlawful in that it violated public policy. Dixon relies on the public policy exception to the employment-at-will doctrine. "Under [this] exception, the at-will doctrine will not insulate an employer from liability where an employee is fired in a manner or for a reason that contravenes a clear and substantial public policy." *Peterson v. Browning*, 832 P.2d 1280, 1281 (Utah 1992).

¶ 30 Dixon claims that at stake here is "the clear public policy ... that an employee be paid fully for all services rendered." Dixon refers to section 34–28–3 of the Utah Code as the pronouncement of this policy. That section states, "All wages shall be paid in full to the employee." Utah Code Ann. § 34–28–3(1)(d) (Supp.1998).

¶ 31 When presented with an asserted public policy exception to the employment-at-will doctrine, this court "recognize[s] the importance of keeping the scope of the public policy exception narrow to avoid unreasonably eliminating employer discretion in discharging employees." *Ryan*, 972 P.2d at 405. "A public policy is 'clear' only if plainly defined by legislative enactments, constitutional standards, or judicial decisions." *Id.* "In addition, ... it is necessary that the policy further substantial *public*, as opposed to private, interests." *Id.* (emphasis in original). " 'Even where ... a statutory touchstone has been asserted, we must still inquire whether the discharge is against public policy and affects a duty which inures to the benefit of the public at large rather than to a particular employer or employee.' " *Id.* (quoting *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, 379 (1988)).

¶ 32 Dixon's claim for wrongful termination does not involve a substantial public interest but, rather, concerns only the conduct and rights of Dixon and the corporation for which he worked. At its core, Dixon's claim is that he should have been paid the sale bonus pursuant to the employment agreement. Dixon has already pursued the remedy for this perceived grievance by filing suit for breach of contract. He cannot seek additional damages by way of a claim for wrongful termination. The district court correctly granted summary judgment in favor of Rentrak on this claim.

## III. STOCK OPTION

■ ¶ 33 We now address Dixon's claim concerning the stock option he attempted to exercise in March of 1996.[4] Dixon maintains that he can sue for profits he allegedly would have realized by purchasing registered stock from Rentrak at the price stated in the consulting agreement and immediately reselling it on the open market. The district court

---

4. As indicated earlier, Dixon did not tender payment for the stock. Ordinarily, "one wishing to recover from a corporation [for] the corporation's failure to recognize the attempted exercise of stock options must establish first that a tender of the amount necessary to purchase the stock was made." 18B Am.Jur.2d *Corporations* § 1982 (1985). Rentrak, however, did not properly raise this issue before the district court; as a result, Dixon did not have an opportunity to assert any exceptions to the tender requirement. We therefore refuse to address the question of whether there was a proper tender.

dismissed this claim, ruling that because the consulting agreement did not specify that the stock option would be for registered, freely tradeable stock, the law presumes that the option was for unregistered, restricted stock that could not be resold for at least one year. The district court also concluded that the parties understood this presumption. It stated:

> When two people who are engaged in the kind of business that this contract implies, both of those people, it seems to me, are prudent enough to understand the implications of a stock option. And in that regard, I think, not even negotiating the stock option, by implication there is an expectation, if not in fact—well, there's a presumption that the people negotiating the stock option know[ ] what that implies and understand[ ] stock and how it can be traded.

¶ 34 Whether the stock option provision granted Dixon an option to purchase registered stock or unregistered, restricted stock is a question of contract interpretation. As stated in *Broyles v. Synercon Corp.*, 512 S.W.2d 288 (Tenn.1974), " 'a stock option agreement is subject to the same rules of construction as any ordinary option, agreement, or contract. The courts in construing such agreements seek to give effect to the intent of the parties....' " *Id.* at 290 (quoting 18 Am.Jur.2d *Corporations* § 303); . *see also Joseph v. Wilson*, 57 Ill.App.3d 212, 14 Ill.Dec. 831, 372 N.E.2d 1110, 1113 (1978) (noting that obligations under stock option contracts, as with any other contract, are "determined in accordance with the intent, conduct and purposes of the parties"); 18B Am.Jur.2d *Corporations* § 1962 (1985) (stating that stock option agreements are generally subject to rules of contract construction).

¶ 35 Here, the consulting agreement provides:

Effective as of the date hereof and, in partial consideration for your agreement with respect hereto, you shall be granted by Rentrak (a) an option to purchase 25,000 shares of Rentrak common stock, immediately exercisable for five years from the date of grant, at a per share exercise price equal to the average of the high and low prices for Rentrak's common stock as quoted on the Nasdaq National Market System as reported by the *Wall Street Journal* on the date hereof....

Nowhere in the agreement is there any indication what kind of stock the parties intended the stock option to entail.

¶ 36 In oral argument before this court, Rentrak conceded that the parties could have specified that Dixon would be entitled to exercise the stock option for registered, freely tradeable stock.[5] Rentrak argues, however, that because such a provision was not included in the consulting agreement, the law presumes that the parties contracted for unregistered stock that Dixon could not have resold immediately. Rentrak asserts that under controlling federal and state laws, the transferability of stock in a public company such as Rentrak is inherently restricted unless it is registered with the Securities Exchange Commission or statutorily exempt from registration. *See* 15 U.S.C.A. § 77e (1997); Utah Code Ann. § 61–1–7 (Supp.1999). Rentrak also points to S.E.C. rule 144, which provides that unregistered securities acquired from an issuer cannot be resold for at least one year from the date of acquisition.[6] *See* 17 C.F.R. § 230.144(d); *see also Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 413 n. 5 (8th Cir.1988) (explaining that S.E.C. rule 144 restricts the transferability of unregistered stock); 17 C.F.R. § 230.144 (1999), Preliminary Note (noting that rule 144 holding peri-

---

**5.** Rentrak's concession in this respect is legally correct. Although Rentrak could have sold Dixon unregistered stock in accordance with a statutory exception from registration, *see* 15 U.S.C.A. § 77d(2) (1997), that does not mean that Rentrak could have sold Dixon *only* unregistered stock or that the contract permitted Rentrak to dictate which type of stock would satisfy the option. Rentrak would not have been prevented legally from selling Dixon registered stock.

**6.** The purpose of the holding period prior to resale is to assure that purchasers of unregistered stock "have assumed the economic risks of investment, and therefore are not acting as conduits for sale to the public of unregistered securities, directly or indirectly, on behalf of an issuer." 17 C.F.R. § 230.144 (1999), Preliminary Note.

od applies to persons who purchase stock that, by statutory exemption, is unregistered). Rentrak asserts that these laws are implicitly contained in the consulting agreement and govern its interpretation. *See Beehive Med. Elec. v. Industrial Comm'n*, 583 P.2d 53, 60 (Utah 1978) (holding contracts implicitly incorporate existing laws).

¶ 37 Without question, stock must be registered or exempt from registration to be sold, *see* 15 U.S.C.A. § 77e (1997); Utah Code Ann. § 61–1–7 (Supp.1999), and if unregistered stock is acquired from an issuer, such as Rentrak, it is subject to certain resale restrictions. *See generally* J. William Hicks, *Resales of Restricted Securities* §§ 4.01 to 8.06 (1993). These principles, however, do not support the district court's conclusion that where a stock option agreement is silent as to whether the stock will be registered or unregistered, the law conclusively presumes that the parties contracted for unregistered stock. The one-year waiting restriction under S.E.C. rule 144, upon which the district court based its ruling, does not even come into play unless it is first determined that the parties intended the stock option to be for unregistered stock. *Cf. McDonald v. Commissioner of Internal Rev.*, 764 F.2d 322, 323 n. 3 (5th Cir.1985) (noting that rule 144 governs sales of *unregistered* stock); *Vohs v. Dickson*, 495 F.2d 607, 620 (5th Cir.1974) (explaining that rule 144 establishes conditions under which *unregistered* securities may be resold).

¶ 38 Here, the stock option provision contains no terms indicating whether the parties contemplated registered or unregistered stock. The provision is ambiguous in this respect. *See Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993) (noting that "contract may be ambiguous because it is unclear or omits terms."). Extrinsic evidence is therefore necessary to ascertain the parties' intentions. *See, e.g., Turner*

*v. Inventors Eng'g, Inc.*, 302 Minn. 278, 224 N.W.2d 357, 358–60 (1974) (upholding jury verdict that former corporate officer was entitled to purchase unrestricted stock where stock option agreement did not specify restricted or unrestricted stock). The district court erred in entering summary judgment against Dixon on his claim for damages concerning the stock option.[7]

## CONCLUSION

¶ 39 On the basis of the foregoing, we affirm the district court's entry of summary judgment against Dixon on his claim for wrongful termination but reverse its summary judgment dismissal of Dixon's claims concerning the sale bonus and stock option and remand for further proceedings.

¶ 40 Chief Justice HOWE, Associate Chief Justice DURHAM, Justice STEWART, and Judge DAVIS concur in Justice RUSSON's opinion.

¶ 41 Having disqualified himself, Justice ZIMMERMAN does not participate herein; Court of Appeals Judge JAMES Z. DAVIS sat.

---

7. Rentrak also argues that Dixon failed to meet his evidentiary burden in opposing summary judgment on his stock option claim. This argument fails. Rentrak identifies no evidence that it brought forth such that the burden would have shifted to Dixon to produce evidence in support of his claim. *See Badger v. Brooklyn Canal Co.*, 922 P.2d 745, 752 (Utah 1996) (holding that nonmoving party need not produce evidence unless moving party first brings forth evidence either tending to prove lack of genuine issue of material fact or challenging existence of element of cause of action). In this case, the entire dispute centered on whether the option was legally presumed to be for restricted stock.