2002 UT App 173

**PREMIER VAN SCHAACK REALTY, INC., a Utah corporation, Plaintiff and Appellant,**

v.

**Thomas K. SIEG, an individual, Defendant and Appellee.**

**No. 20010031–CA.**

Court of Appeals of Utah.

May 23, 2002.

Paul D. Veasy and R. David Grant, Parsons Behle & Latimer, Salt Lake City, for Appellant.

Dean L. Gray and John F. Gray, Liapis Gray & Stegall, Salt Lake City, for Appellee.

Before JACKSON, Presiding Judge, and GREENWOOD, and THORNE, JJ.

## OPINION

GREENWOOD, Judge:

¶ 1 Premier Van Schaack Realty, Inc. (Premier) seeks to enforce the brokerage fee payment provided in the listing agreement (the Agreement) it entered into with Thomas K. Sieg (Sieg) regarding the sale of real property located at 273 North East Capital, Salt Lake City, Utah (the Property). Premier appeals the trial court's grant of summary judgment to Sieg, arguing that: (1) a sale or exchange occurred pursuant to the Agreement; and (2) Sieg was not entitled to attorney fees. We affirm.

## BACKGROUND

¶ 2 On February 7, 1997, Sieg entered into the Agreement with Coldwell Banker. Coldwell Banker subsequently assigned the Agreement to Premier. The Agreement provisions relevant to this appeal state:

> BROKERAGE FEE. If, during the Listing period, [12 months] [Premier], the Listing Agent, the Owner, another real estate agent, or anyone else locates a party who is ready, willing and able to buy, sell or exchange (collectively referred to as "acquire") the Property, or any part thereof, at the listing price and terms stated on the attached board/association property data information form, or any other price or terms to which the Owner may agree in writing, the Owner agrees to pay to [Premier] a brokerage fee in the amount of seven percent (7%) of such acquisition price. . . .
>
> . . . .
>
> ATTORNEYS FEES. Except as provided in section 7, in case of the employment of an attorney in any matter arising out of this Listing Agreement (including the sale of the Property) the prevailing party shall be entitled to receive from the other party all costs and reasonable attorney's fees, whether the matter is resolved through court action or otherwise.

¶ 3 In March 1997, Premier's real estate agent introduced Sieg to Michael Davis, Marion Vaughn, and Jane Johnson (DVJ), who offered to purchase the Property for $1.3 million. Sieg made a counter-offer that DVJ

accepted. However, the anticipated sale never closed, and Sieg returned DVJ's earnest money.

¶ 4 In June 1997, DVJ proposed that they form a limited liability company (LLC) with Sieg. On September 26, 1997, DVJ and Sieg signed an operating agreement (the Operating Agreement), forming the LLC, MJTM. The Operating Agreement provided that Sieg would convey the Property to MJTM and Sieg would receive a 40% interest in MJTM and a preferential return of 9% on future profits. The Operating Agreement also provided that Sieg had a beginning balance of $670,000 in his initial capital contribution account and that MJTM assumed $580,000 of Sieg's debt. The other members of MJTM agreed not to encumber the Property without Sieg's approval. The Operating Agreement stated that the agreed value of the Property was $1.3 million. Furthermore, the Operating Agreement provided, "No Member shall be personally liable to any other Member for the return of any part of the Members' Capital Contributions." On January 21, 1998, Sieg transferred title to the Property to MJTM by warranty deed.

¶ 5 In January 1998, MJTM borrowed $1.413 million from Zions Bank secured by a lien on the Property. All of the members of MJTM personally guaranteed the loan. With the proceeds from this loan, MJTM paid off a $300,000 loan to Sieg secured by the Property.

¶ 6 When Premier discovered that Sieg had entered into this arrangement with MJTM, it demanded its commission of 7% of $1.3 million. Sieg refused to pay, claiming that his contribution of the Property was an investment and not a sale or exchange; thus Premier filed suit. On cross-motions for summary judgment the trial court ruled in favor of Sieg, holding that the transaction between Sieg and MJTM was not a sale or exchange pursuant to the Agreement because it lacked consideration. Additionally, the trial court awarded attorney fees to Sieg pursuant to the Agreement. This appeal followed.

## ISSUES AND STANDARD OF REVIEW

¶ 7 "Summary judgment is appropriate only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. We review a trial court's grant of summary judgment for correctness, giving no deference to its conclusions of law." *Jones v. ERA Brokers Consol.*, 2000 UT 61,¶ 8, 6 P.3d 1129. We review the facts of this case in the light most favorable to the non-moving party. *See Dixon v. Pro Image, Inc.*, 1999 UT 89,¶ 12, 987 P.2d 48. Additionally, we review the award of attorney fees for correctness. *See Softsolutions, Inc. v. Brigham Young Univ.*, 2000 UT 46,¶ 12, 1 P.3d 1095. However, we review whether attorney fees are reasonable under an abuse of discretion standard. *See id.*

## ANALYSIS

### I. Sale or Exchange

¶ 8 Premier argues that a sale or exchange occurred as defined in the Agreement; thus triggering the 7% commission provision. The Agreement states:

BROKERAGE FEE. If, during the Listing period, [Premier], the Listing Agent, the Owner, another real estate agent, or anyone else locates a party who is ready, willing and able to buy, sell or exchange (collectively referred to as "acquire") the Property, or any part thereof, at the listing price and terms stated on the attached board/association property data information form, or any other price or terms to which the Owner may agree in writing, the Owner agrees to pay to [Premier] a brokerage fee in the amount of seven percent (7%) of such acquisition price . . . .

Because this court interprets contracts according to their plain meaning, *see Dixon v. Pro Image, Inc.*, 1999 UT 89, ¶ 13, 987 P.2d 48, Premier must show the following to prevail: (1) that there was a party who was ready, willing, and able to buy or exchange the Property; (2) that Sieg agreed to a sale or exchange; and (3) that the sale or exchange occurred during the term of the Agreement. For purposes of this appeal, we assume that the alleged sale or exchange occurred during the term of the Agreement.

Indeed, there is no dispute that the transfer to MJTM took place during the term of the Agreement.

¶ 9 Consequently, we are left to decide whether a sale or exchange occurred between Sieg and MJTM triggering the commission provisions of the Agreement. Under Utah law, "sale" has been defined as, "the conveyance of title to the purchaser for a valuable consideration consisting of the purchase price, or the execution and delivery of a valid and enforceable contract of sale whereby some estate in land, legal or equitable, passes to the purchaser." *Lewis v. Dahl*, 108 Utah 486, 161 P.2d 362, 365 (1945). While "exchange" has not been judicially defined in Utah, this court will apply its plain meaning when interpreting the Agreement. *See Dixon*, 1999 UT 89 at ¶ 13, 987 P.2d 48. The plain meaning of "exchange" is, "the act of giving or taking one thing in return for another." Webster's Ninth New Collegiate Dictionary 432 (9th ed.1986); *see also* Black's Law Dictionary 585 (7th ed.1999). These definitions demonstrate that to have either a sale or an exchange, there must be consideration. *Compare Lewis*, 161 P.2d at 365; Black's Law Dictionary 562 (6th ed.1990) *with Aquagen Int'l, Inc. v. Calrae Trust*, 972 P.2d 411, 413 (Utah 1998) ("Consideration sufficient to support the formation of a contract requires that a performance or a return promise must be bargained for." (Citation and quotations omitted.)) and *Resource Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1036 (Utah 1985) ("Consideration is an act or promise, bargained for and given in exchange for a promise.").

¶ 10 Premier argues that Sieg received consideration from MJTM in several different ways. First, Sieg received a 40% interest in MJTM in exchange for the Property. Second, Sieg was entitled to a 9% preferential return from MJTM on all future profits. Third, Sieg had a beginning balance of $670,000 in his initial capital contribution account. Finally, MJTM promised to assume $580,000 of Sieg's debt.[1]

¶ 11 Sieg contends that each of these alleged indicia of consideration fails for various reasons. Sieg argues that the interest in MJTM Premier relies on cannot serve as consideration because Sieg maintained an ownership interest in the Property. Additionally, Sieg argues that the alleged debt relief fails as consideration because Sieg was personally liable for his personal debt plus the debt of MJTM to Zions Bank.

¶ 12 To support his argument, Sieg cites *Cooley Investment Co. v. Jones*, 780 P.2d 29 (Colo.Ct.App.1989), and *Dahdah v. Continent Realty, Inc.*, 434 So.2d 997 (Fla.Dist.Ct.App. 1983) (per curiam), for the proposition that the 40% interest and 9% preferential return on future profits in exchange for the Property cannot be valuable consideration. In both *Cooley* and *Dahdah*, the property owner entered into a listing agreement with a realtor to sell his or her property. *See Cooley*, 780 P.2d at 30; *Dahdah*, 434 So.2d at 998. In both cases, the owner decided to convey the property to a partnership or joint venture in which the owner was a member in exchange for: (1) an interest in the joint venture; (2) a preferential interest in future profits; and (3) an initial capital contribution account balance that received no interest over time. *See Cooley*, 780 P.2d at 30–31; *Dahdah*, 434 So.2d at 998. In each case, the court held that no sale or exchange occurred. Each court reasoned:

> Thus, *because the defendant retained an ownership interest in the property*, there was only a change in the form of ownership, not a transfer of the property to another entity.

> Further, the conveyance of the title to the property cannot be considered to be a "sale." Under the agreement between defendant and [the other partner], defendant received only a credit for a capital contribution of $500,000, which represented the market value of the property. She re-

---

1. Premier also argues that this court should find consideration because the other members of MJTM promised not to encumber the Property without Sieg's approval. However, "because [Premier] did not properly raise [this] issue[ ] in the trial court ... and because [it] argued [this issue] for the first time in [its] reply brief, we decline to review [the issue]." *Coleman v. Stevens*, 2000 UT 98, ¶ 9, 17 P.3d 1122; *see also* Utah R.App. P. 24(c) ("Reply briefs shall be limited to answering any new matter set forth in the opposing brief.").

ceived no other compensation; there was no unconditional promise on the part of the partnership, or anyone else, to pay her anything; there was no security given to her; and she was not entitled to receive any interest payments on her capital account. Defendant's only right was to receive a share of future profits, if any.

*Cooley,* 780 P.2d at 31 (emphasis added) (internal citations omitted).

[A] sale did not occur because *the owner retained an ownership interest in the property.* Rather than assuming the risk of a seller, the owner assumed the risk of a participant in a joint venture with the potential for losses as well as profits. As such, the owner decided to develop the property herself.

The exclusive right of sale contract did not address the situation where the owner develops the property herself in the form of a joint venture. The exclusive right of sale contract should be construed against the broker as drafter of the document. Consequently, if the broker wanted a commission in the event the owner entered into a joint venture with other parties regarding the property, the broker should have spelled that out in the contract.

*Dahdah,* 434 So.2d at 998–99 (quoting *Miller, Cowherd & Kerver, Inc. v. De Montejo,* 406 So.2d 1196 (Fla.Dist.Ct.App.1981)) (emphasis added).

¶ 13 Like the property owners in *Cooley* and *Dahdah,* Sieg retained a substantial ownership interest in the Property that caused him to assume the risks of an investor instead of the risks of a seller. By illustration, when a person undertakes the risks of an investor, that person assumes the risk that the value of investment will increase or decrease over time, or that the investment may be completely lost. However, as a general rule, once a person sells property, appreciation, depreciation, or total loss of the property is of no concern since the sale severs the

seller from any interest in the property. Sieg still retained a significant ownership interest in the Property, including the potential value of its future sale and the present right to prevent MJTM from encumbering the Property without his permission. *See Pride Oil Co. v. Salt Lake County,* 13 Utah 2d 183, 370 P.2d 355, 356 (1962) (holding that "[the right to own property] includes the right to sell it"); *Ritholz v. City of Salt Lake,* 3 Utah 2d 385, 284 P.2d 702, 705 (1955) ("Clearly among the rights attendant upon ownership and enjoyment of property are the rights to exchange, pledge, sell or otherwise dispose of it. . . ."). Moreover, the value of Sieg's interest in MJTM is directly tied to the value of the Property because the Property is the only asset MJTM owned. Therefore, because Sieg retained such a substantial ownership interest in the Property, the transaction between Sieg and MJTM does not constitute a sale or exchange as contemplated in the Agreement.

¶ 14 Additionally, Premier's argument that the debt relief is consideration fails because Sieg personally guaranteed the $1.413 million loan that MJTM used to pay $300,000 of Sieg's debt. Simply stated, MJTM did not actually relieve Sieg of debt, but rather caused him to personally incur nearly three times more debt than he owed on the Property prior to joining MJTM. MJTM had no ability to pay Sieg's debt itself, without securing a loan secured by the Property, MJTM's only asset. Therefore, under the facts of this case, the debt relief promised in the Agreement was illusory.[2]

¶ 15 Premier argues that, unlike the partnership and joint venture in *Cooley* and *Dahdah,* a limited liability company under Utah, Colorado, and Florida law is a separate legal entity that is able to buy property in its own name. *See* Utah Code Ann. § 48–2c–104 (Supp.2001); Colo.Rev.Stat. Ann. §§ 7–80–104; 7–80–107 (2001) (stating limited liability companies can own property separate from their owners); Fla. Stat. Ann. § 608.404

---

2. Each of the cases in support of both Sieg's and Premier's argument do not consider the initial capital account balance as consideration unless it received interest payments. *See Cooley Inv. Co. v. Jones,* 780 P.2d 29, 31 (Colo.Ct.App.1989); *Dahdah v. Continent Realty, Inc.,* 434 So.2d 997,

998 (Fla.Dist.Ct.App.1983); *Hagan v. Adams Prop. Assocs., Inc.,* 253 Va. 217, 482 S.E.2d 805, 807 (1997). Since no interest was credited to Sieg's initial capital account, the account is not consideration.

(2001) (same).[3] Because a limited liability company is an entity distinct from its owners, Premier argues that if a seller of property transfers his property to a limited liability company or to a corporation of which he is the sole shareholder, such a transaction would constitute a sale or exchange. *See Hagan v. Adams Prop. Assocs., Inc.,* 253 Va. 217, 482 S.E.2d 805, 807 (1997) (holding that limited liability company can exchange property for debt relief in its own name because it is an entity separate from its members). We believe, however, that focusing on the legal structure of the transferee averts attention from the critical question of whether there was valuable consideration.

¶ 16 Whether a sale or exchange for valuable consideration occurred is a fact-intensive inquiry that requires more than a mere showing that an owner transferred his property to a separate legal entity. In this case, Sieg's credit to his capital contribution account and debt assumption roughly approximate the $1.3 million value of the Property. The preferential interest in future profits and the Zions Bank loan reflect the investment nature of the transaction. Where the owner retains essentially the same ownership interest in the property as he had prior to the conveyance, with plans to develop the property by improving it with the possibility of future gains or losses, and can prevent the record owner from encumbering the property without his permission, such a transaction is not a sale or exchange. Therefore, because the facts in this case show Sieg continued to have substantially the same ownership interest in the Property after the deed to MJTM was executed, there was no consideration and a sale or exchange as contemplated in the Agreement did not occur.

## II. Attorney Fees

¶ 17 Premier argues that since there was a sale or exchange of the Property, the trial court erred in granting Sieg attorney fees and in not awarding Premier attorney fees and prejudgment interest. The Agreement states:

ATTORNEYS FEES. Except as provided in section 7, in case of the employment of an attorney in any matter arising out of this Listing Agreement (including the sale of the Property) the prevailing party shall be entitled to receive from the other party all costs and reasonable attorney's fees, whether the matter is resolved through court action or otherwise.

"In interpreting a contract, the intentions of the parties are controlling. If the contract is written and the language employed is not ambiguous, the parties' intentions are determined from the plain meaning of the language." *Dixon v. Pro Image, Inc.,* 1999 UT 89, ¶ 13, 987 P.2d 48 (citations and quotations omitted). According to the plain meaning of the contract, the prevailing party is entitled to attorney fees.[4]

¶ 18 However, Premier argues that even if it loses on appeal, this court should still reverse the trial court's award of attorney fees because the trial court abused its discretion in holding that Sieg's attorney fees were reasonable because Sieg failed to comply with the requirements of Rule 4–505 of the Utah Code of Judicial Administration. Under rule 4–505(1),

Affidavits in support of an award of attorney fees must be filed with the court and set forth specifically the legal basis for the award, the nature of the work performed by the attorney, the number of hours spent to prosecute the claim to judgment, or the time spent in pursuing the matter to the stage for which attorney fees are claimed, and affirm the reasonableness of the fees for comparable legal services.

Premier argues that the trial court abused its discretion because Sieg failed to state: (1) the legal basis for attorney fees; (2) the number of hours spent; and (3) the nature of the work performed by the attorney. Sieg argues that although his affidavit does not meet all of the requirements of rule 4–505(1),

---

3. We note that both Colorado and Florida have not decided any cases under their limited liability company statutes.

4. Premier also argues that it is entitled to prejudgment interest. However, because we affirm the trial court's ruling that no sale or exchange occurred, the prejudgment interest claim also fails.

it is adequate because the trial court was sufficiently familiar with the case to make the determination without a precise affidavit. Each requirement is discussed in order below.

¶ 19 First, while Sieg omitted the legal basis for seeking attorney fees from his affidavit, this does not warrant reversal by itself because the parties and the judge knew the legal basis for seeking attorney fees. In *Hall v. NACM Intermountain, Inc.*, 1999 UT 97, 988 P.2d 942, the supreme court held that because both the court and counsel were aware of the legal basis for seeking attorney fees, there was no prejudice from a failure to state a legal basis in the affidavit. *See id.* at ¶ 21. In this case, the trial court and counsel knew that the Agreement provided the legal basis for attorney fees. Therefore, Sieg's omission does not warrant reversal.

¶ 20 Second, the affidavit states the number of hours the attorney spent in prosecuting the matter. Sieg details the number of hours his attorney and an associate worked on the case as well as the rate at which each billed. Therefore, Sieg's counsel complied with the second requirement of rule 4–505(1).

¶ 21 Finally, Premier argues that Sieg failed to explain the nature of the services his attorney rendered. Under Utah law, the party claiming attorney fees is required to provide the trial court with sufficient evidence to allow a determination of reasonableness. *See Cabrera v. Cottrell,* 694 P.2d 622, 624 (Utah 1985). Although the evidence Sieg produced at trial is not ideal, it is sufficient because the parties and the trial court knew that the dispositive issue in this case was whether there was adequate consideration to support a sale or exchange. The record shows that the trial court was very familiar with this issue and the quality of the work Sieg's counsel provided. Therefore, under the facts of this case and the discretion accorded to the trial court, the evidence presented was sufficient to affirm the award of attorney fees.

## CONCLUSION

¶ 22 In sum, the transfer of the Property from Sieg to MJTM was not supported by consideration so as to constitute a sale or exchange. Because no sale or exchange occurred, Sieg owes no commission under the Agreement. Since Sieg has prevailed below and on appeal, he was correctly awarded attorney fees and is entitled to fees incurred on appeal. Accordingly, we affirm the trial court's decision on both issues and remand to the trial court to determine the amount of reasonable attorney fees Sieg is entitled to as a result of this appeal.

¶ 23 WE CONCUR: NORMAN H. JACKSON, Presiding Judge, and WILLIAM A. THORNE JR., Judge.