2000 UT 46

**SOFTSOLUTIONS, INC., Plaintiff and Appellant,**

v.

**BRIGHAM YOUNG UNIVERSITY, Defendant and Appellee.**

**No. 981481.**

Supreme Court of Utah.

May 19, 2000.

Earl Jay Peck, Clark R. Nielsen, David B. Hartvigsen, Salt Lake City, for plaintiff.

Eugene H. Bramhall, David B. Thomas, Provo, for defendant.

WILKINS, Justice:

¶1 Appellant Softsolutions, Inc., appeals from an order of the district court denying its motion to vacate or modify an arbitration award and granting appellee Brigham Young University's (BYU) motion to confirm the arbitration award. We affirm the district court's order confirming the arbitration award, but we remand the case to the district court to recalculate its award of attorney fees in light of this opinion.

## BACKGROUND

¶2 This case arises as a result of a series of software licensing agreements entered into between 1987 and 1990 by BYU and Softsolutions, the last of which was executed on June 1, 1990 (the Agreement). The Agreement provided that BYU would give Softsolutions an exclusive license to use its software technology called D–Search in exchange for royalty payments. The Agreement mandated mediation followed by arbitration for resolution of any contractual disputes.

¶3 The arbitration provision of the Agreement expressly set forth the scope of the arbitrator's powers and prohibited the arbitrator from "add[ing] to, subtract[ing] from or modify[ing] any of the terms or conditions" of the Agreement.[1] The Agreement provided that in the event of arbitration, the prevailing party was to "be paid by the other party a reasonable sum for attorneys' fees and costs." Another provision of the Agree-

---

1. Paragraph 15.1 of the Agreement provided in part:

Except as to issues relating to the validity, construction or effect of any patent licensed, the parties must, with respect to any and all claims, disputes or controversies arising under, out of, or in connection with this Agreement, attempt in good faith to resolve those claims, disputes or controversies by negotiations between the parties. In the event either party believes the negotiation discussions are not likely to result in settlement, the parties must, in good faith, participate in mediation sessions with a mediator to be mutually selected by the parties and the expense of which is to be paid 50 percent by each party. In the event, after one or more mediation sessions, either party believes the mediation process is not likely to resolve the dispute by mutual agreement, *the dispute shall be resolved by final and binding arbitration* in Provo, Utah. Each party shall choose one arbitrator and these two arbitrators shall in turn select a third arbitrator, which three arbitrators shall constitute the arbitration panel. *The arbitrators shall have no power to add to, subtract from or modify any of the terms or conditions of this Agreement.*
(Emphasis added.)

ment also provided that Softsolutions was to "pay all reasonable collection costs at any time incurred by BYU in obtaining payment of amounts past due, including court costs, expenses associated with litigation, and reasonable attorneys' fees, whether or not suit was commenced by BYU."

¶ 4 Almost immediately after the Agreement was executed and Softsolutions began using D–Search, a dispute arose between the parties concerning various competitors infringing on the patented software. When negotiations failed, the matter was submitted to mediation, as required by the Agreement. In July 1993, Softsolutions removed D–Search from its products and replaced it with another technology. In January 1994, WordPerfect purchased the stock of Softsolutions Technology Corporation (STC), an affiliate of Softsolutions. WordPerfect was later acquired by Novell.

¶ 5 In February 1994, BYU initiated arbitration proceedings. In preparation for the arbitration, counsel for both parties prepared and submitted to the arbitrator a joint statement of issues to be arbitrated (the Submission Agreement). Arbitration ensued, and in July 1996, the arbitrator entered his arbitration award, granting BYU $1,672,467 in royalties and $115,000 in attorney fees. The award gave BYU royalties on sales made prior to March 1996. In his decision, the arbitrator described the issues submitted for arbitration in a fashion different from that included in the Submission Agreement of the parties.

¶ 6 Thereafter, Softsolutions filed an action for declaratory judgment in the district court seeking to have the arbitration award vacated or modified pursuant to Utah Code Ann. §§ 78–31a–14(1)(c) and 78–31a–15(1)(b) (1996). Softsolutions claimed that the arbitrator exceeded the powers granted to him under the terms of both the Agreement and the Submission Agreement or, alternatively, had based the award on matters not submitted to him. In response, BYU filed a motion with the court to confirm the arbitration award pursuant to section 78–31a–12 of the Utah Code. The parties then stipulated to consolidate the actions and agreed that the two motions would be treated as cross-motions.

¶ 7 On February 10, 1998, the district court denied Softsolutions' motion to vacate or modify the arbitrator's award, ruling that the arbitrator did not exceed his powers or base the award on a matter not submitted by the parties for arbitration. In so ruling, the district court adopted the arbitrator's description of the arbitrable issues. The district court granted BYU's motion to confirm the arbitration award, relying on Utah Code Ann. § 78–31a–12 (1996). The district court subsequently entered its judgment on July 7, 1998, awarding BYU $28,987.50 in additional attorney fees for the work of its in-house counsel in the action before the district court. The court based this calculation on what it determined was the current market rate of $150 per hour charged by attorneys engaged in similar private practice. The entire award including the additional attorney fees totaled $1,816,454.50, plus interest. Softsolutions appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 8 Softsolutions presents two issues on appeal. First, it argues that the district court erred in denying its motion to vacate or modify the arbitration award because the arbitrator exceeded his jurisdiction by arbitrating matters not included in the parties' Submission Agreement or the Agreement.

¶ 9 Second, Softsolutions argues that the district court improperly awarded attorney fees to BYU for its in-house attorneys. Specifically, it argues that the attorney fees are non-recoverable as a matter of law, but that even if they are recoverable, the amount awarded is excessive and unreasonable.

¶ 10 To a significant degree, our decision turns on application of the correct standard of review by the district court and by this court in reviewing the district court's decision. There are two standards applicable to the review of arbitration awards. In *Buzas Baseball, Inc. v. Salt Lake Trappers, Inc.*, 925 P.2d 941, 947–48 (Utah 1996), we described both the standard to be applied by the district court and that to be used by an appellate court to review the district court's

proceedings. The standard of review for a trial court "is an extremely narrow one" giving " 'considerable leeway to the arbitrator,' " and setting aside the arbitrator's decision " 'only in certain narrow circumstances.' " *Id.* at 947 (quoting *First Options v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 1923, 131 L.Ed.2d 985 (1995)). The trial court "may not substitute its judgment for that of the arbitrator, nor may it modify or vacate an award because it disagrees with the arbitrator's assessment." *Id.*

¶ 11 When, as here, the award is challenged on the ground that the arbitrator exceeded his or her authority, the trial court applies a two-pronged test. First, "to find that an arbitrator has exceeded his authority, a court must review the submission agreement and determine whether the arbitrator's award covers areas not contemplated by the agreement." *Id.* at 949, 115 S.Ct. 1920. If not, there is one additional limited circumstance under which the arbitrator's award may have exceeded his authority. The second prong to be applied by the trial court is to determine whether an award is " 'without foundation in reason or fact.' " *Id.* at 950, 115 S.Ct. 1920 (quoting *Brotherhood of R.R. Trainmen v. Central Ga. Ry.,* 415 F.2d 403, 411–12 (5th Cir.1969)). This second prong is referred to as the "irrationality principle" and is based on the "assumption ... that the parties, by their agreement to arbitrate, have given the arbitrator the authority to decide their dispute on a rational basis." *Id.*

¶ 12 In reviewing the order of the district court confirming, vacating, or modifying an arbitration award, we grant no deference to the court's conclusions of law, reviewing them for correctness. We review the district court's findings of fact under the clearly erroneous standard. More specifically, our "scope of review is limited to the legal issue of whether the trial court correctly exercised its authority in confirming, vacating, or modifying an arbitration award." *Intermountain Power Agency v. Union Pac. R.R. Co.,* 961 P.2d 320, 323 (Utah 1998). Additionally, "[w]hether attorney fees are recoverable in an action is a question of law, which we review for correctness." *Valcarce v. Fitzgerald,* 961 P.2d 305, 315 (Utah 1998).

However, the district court has "broad discretion in determining what constitutes a reasonable fee, and we will consider that determination against an abuse-of-discretion standard." *Dixie State Bank v. Bracken,* 764 P.2d 985, 991 (Utah 1998).

## ANALYSIS

### I. ARBITRATION AWARD

¶ 13 Softsolutions maintains that the district court should have vacated or modified the arbitration award based upon either of two statutory grounds: the arbitrator exceeded his jurisdiction, in violation of Utah Code Ann. § 78–31a–14(1)(c) (1996), or the arbitrator based the award on a matter not submitted to him, in violation of Utah Code Ann. § 78–31a–15(1)(b) (1996). Under both grounds, Softsolutions argues that the arbitrator erred by (1) rephrasing and essentially enlarging the first issue in the Submission Agreement, (2) awarding royalties on sales of Softsolutions' software products that did not contain D–Search technology, (3) awarding royalties on software sales made by non-affiliates of Softsolutions, (4) disregarding the one-year limitation period in the Agreement, and (5) awarding royalties on software sales made after the Agreement had automatically terminated by its own terms. Softsolutions maintains that any one of these errors standing alone was a sufficient basis for the district court to either vacate or modify the award.

¶ 14 The Utah Arbitration Act, §§ 78–31a–1 to –20 (the Act), governs the arbitration process. "The Act supports arbitration of both present and future disputes and reflects long-standing public policy favoring speedy and inexpensive methods of adjudicating disputes." *Allred v. Educators Mut. Ins. Ass'n of Utah,* 909 P.2d 1263, 1265 (Utah 1996). "[T]he standard for reviewing an arbitration award is highly deferential to the arbitrator." *Buzas,* 925 P.2d at 946; *see also Intermountain Power Agency,* 961 P.2d at 323. Generally, " 'an arbitration award will not be disturbed ... because the court does not agree with the award as long as the proceeding was fair and honest and the substantial rights of the parties were respected.' " *Buzas,* 925

P.2d at 947 (quoting *DeVore v. IHC Hosps., Inc.*, 884 P.2d 1246, 1251 (Utah 1994)). Moreover, "[g]iven the public policy and law in support of arbitration, judicial review of arbitration awards confirmed pursuant to the Act is limited to those grounds and procedures provided for under the Act." *Allred*, 909 P.2d at 1265.

■ ¶ 15 Under the Act, a court must vacate an arbitration award if it appears that "the arbitrators exceeded their powers." Utah Code Ann. § 78–31a–14(1)(c) (1996). For a court reviewing an arbitration award to determine that an arbitrator exceeded his authority, a court must (1) review the submission agreement and determine that the "arbitrator's award covers areas not contemplated by the submission agreement," or (2) determine that an award is "'without foundation in reason or fact.'" *Buzas*, 925 P.2d at 950 (two-pronged *Buzas* test) (quoting *R.R. Trainmen*, 415 F.2d at 411–12); *see also Intermountain Power Agency*, 961 P.2d at 323 ("Whether the court agrees with the arbitrator's judgment is irrelevant, as long as the arbitrator construed and applied the contract in an arguably reasonable manner and acted fairly and within the scope of his authority.").[2]

¶ 16 The Act requires a court to modify an arbitration award if it appears that "the arbitrators' award is based on a matter not submitted to them, if the award can be corrected without affecting the merits of the award upon the issues submitted." Utah Code Ann. § 78–31a–15(1)(b) (1996). We now address Softsolutions' claims of error under these statutory grounds.

### A. Rephrasing of the Submission Agreement

■ ¶ 17 First, Softsolutions argues that the district court erred in refusing to vacate or modify the award because the arbitrator erroneously recast the eight issues submitted to the arbitrator. Softsolutions argues that by restating the first and primary issue submitted for decision, the arbitrator improperly obtained unfettered jurisdiction to determine any matter relating to royalties, whether based upon the contract or not. In other words, Softsolutions argues that the arbitrator exceeded the scope of his jurisdiction by deleting terms and modifying others to add royalty obligations not found within the terms of the Agreement. We disagree.

¶ 18 The first issue charged the arbitrator with determining: "What amount of royalties were earned under the D–Search licensing agreement(s) with BYU; and what amount has been paid?" The arbitrator reframed this question into "What amount of royalties are due BYU by Softsolutions, Inc.?" The district court also adopted this wording. We are not convinced that the rephrasing of this issue, or any other presented for our review, gave the arbitrator "unbounded jurisdiction" to determine any issue relating to the royalties, as Softsolutions suggests. Rather, the arbitrator stayed within the confines of the first question submitted for resolution. Specifically, the arbitrator stated that "Softsolutions is indebted to BYU in the amount of $1,672,467" as a result of the D-search technology, and that Softsolutions did not make royalty payments as dictated in the contract. This ruling, although framed differently than the question submitted for resolution, certainly addresses what royalties were earned and the amount paid by Softsolutions. Because the arbitrator ruled on the matter submitted for resolution and did not stray from the scope of authority delegated to him by the parties, this challenge presents no basis to vacate or modify the arbitration award.

---

2. In *Intermountain Power Agency*, we stated:
   [A]n arbitrator exceeds his or her powers if the arbitrator strays beyond the scope of the questions submitted for arbitration by the parties. The scope of the parties' dispute as defined in their written agreement to arbitrate establishes the scope of the arbitrator's authority in resolving the conflict. An arbitration awarding purporting to resolve questions beyond that jurisdictional boundary is not valid. For a court to find that an arbitrator has exceeded his or her delegated authority, the court must determine that "the arbitrator's award covers areas not contemplated by the submission agreement." In addition, an arbitrator exceeds his or her delegated power if the arbitration award has no "'foundation in reason or fact'" and is, therefore, "'completely irrational.'"
   961 P.2d at 323 (citations omitted).

### B. Award of Royalties on Software Products that Did Not Contain D–Search Technology

¶ 19 Second, Softsolutions argues that the district court erred in refusing to vacate or modify the award because, despite finding that Softsolutions discontinued D–Search in July 1993, the arbitrator erroneously imposed royalties on the sale of Softsolutions' products that did not contain D–Search technology, contrary to the express terms of paragraph 4.1A of the Agreement.

¶ 20 Paragraph 4.1A of the Agreement provided that Softsolutions was obligated to pay BYU

> [a]n earned royalty in an amount equal to five (5) percent of the Net Sales of the Licensed Products or Licensed Processes used, leased or sold by or for Softsolutions and its Affiliates, including packaged software products, custom software applications ... containing the Licensed Process(es) and the support of custom software applications ... containing the Licensed Process(es).

Accordingly, under the Agreement, royalties were imposed only on Softsolutions' products which actually contained D–Search technology.

¶ 21 One question submitted by the parties read: "Was use of D–Search discontinued so that potential royalties stopped accruing? If so, when?" Another question read: "What amount of royalties were earned under the D–Search licensing agreement(s) with BYU; and what amount has been paid?" The arbitrator concluded: "Softsolutions did not need to replace the technology of D–Search; therefore, Softsolutions could not avoid royalty payments by using a substitute search engine. D–Search was capable of performing if Softsolutions fully understood the technology of D–Search and implemented the technology accordingly." As such, the arbitrator awarded BYU royalties on sales of Softsolutions' software which did not contain D–Search technology.

¶ 22 Softsolutions argues (1) that the jurisdictional question limited the arbitrator's authority only to deciding whether the use of D–Search was discontinued so that potential royalties stopped accruing and when, and (2) that by awarding royalties from the sales of products not containing D–Search, the arbitrator ignored both the Submission Agreement and sections 4.1 and 15.1 of the Agreement.

¶ 23 In refusing to vacate the award, the district court reasoned:

> Under the License Agreement—Paragraph 3.1, "Softsolutions shall, during the term of this agreement, use its best efforts to bring one or more Licensed Products or Licensed Processes to the market through a thorough, vigorous and diligent program designed to commercially develop the Licensed Technology to its full market potential." ... Given an express contractual duty to use D–Search under the Exclusive License Agreement and a finding that Softsolutions did not need to replace D–Search, an award on sales which should have contained D–Search is not irrational and is derived in a logical way from the wording of the contract. Additionally, the court finds an award of royalties on sales after July, 1993 falls squarely within the questions submitted by both parties in the Joint Statement of Issues to be Arbitrated by Arbitrator Rokich. The questions submitted included a question as to the amount of royalties due BYU by Softsolutions, Inc., and the arbitrator was specifically charged with determining whether the use of the intellectual property discontinued so that royalties stopped accruing.

(Emphasis omitted.)

¶ 24 We conclude that the district court properly applied the two-pronged test in *Buzas* in determining whether to vacate the arbitration award on this basis. Certainly, the issue of whether to award royalties on sales before or after D–Search was removed falls within the ambit of issues submitted by the parties for resolution—that is, the questions regarding the amount of royalties BYU earned as well as whether the D–Search was discontinued. Moreover, the award is based on a rational interpretation of the Agreement. As such, the district court did not err in refusing to vacate the award under section 78–31a–14(1)(c). Additionally, the district court properly refused to modify the award

under section 78–31a–15(1)(b), as this issue was submitted for decision.

### C. Royalties on Software Sales Made After the 1994 Stock Sale

■ ¶ 25 Third, Softsolutions argues that the district court erred in refusing to vacate or modify the award because the arbitrator ignored express provisions in the Agreement by awarding $935,000 in royalties on software sales made by "non-affiliates" of Softsolutions, namely, WordPerfect and Novell. Essentially, Softsolutions argues that royalties on sales by WordPerfect and Novell were not "earned" under paragraph 4.1A of the Agreement because these companies were not "affiliates" of Softsolutions, as defined by paragraph 1.1 of the Agreement. Softsolutions maintains that its royalty obligations ceased when STC, an affiliate of Softsolutions, was purchased by WordPerfect on January 24, 1994, and was later acquired by Novell. However, STC remained an "affiliate" even after the sale of control of STC to WordPerfect and eventually to Novell.

¶ 26 Furthermore, the parties' Agreement described which sales were subject to royalties. Paragraph 2.1 of the Agreement provided:

> BYU hereby grants ... Softsolutions the ... right and license to utilize the Licensed Technology, specifically identified as D–Search ... until such time as this agreement is terminated. This grant will extend to the manufacture, sale, lease, transfer or other disposition of Licensed Products or Licensed Processes through an Affiliate.

¶ 27 Paragraph 4.1A of the licensing agreement provided that "Softsolutions shall pay to BYU an 'earned' royalty in the amount of five (5) percent of the Net Sales of the Licensed Products or Licensed Processes used, leased or sold by or for Softsolutions and its Affiliates."

■ ¶ 28 In denying Softsolutions' motion to vacate the arbitrator's award, the district court considered the two factors set forth in *Buzas*. It determined that the first prong in *Buzas* was met because one of the issues to be arbitrated was the amount of royalties

Softsolutions owed to BYU. It found that an award based on royalties before or after January 24, 1994, was well within this question. Moreover, the court found that award was not "irrational or inconsistent" with the wording of the Agreement to award royalties.

¶ 29 We agree with the district court that there is no basis to vacate the award under section 78–31a–14(1)(c) of the Utah Code. The arbitrator clearly stayed within the confines of the Submission Agreement, and his ruling had a foundation in reason and fact. Therefore, the district court did not err in determining that the arbitrator did not exceed his powers. Moreover, we agree with the district court that because this matter falls within the issues submitted for arbitration, there was no basis for the district court to modify the award under section 78–31a–15(1)(b) of the Utah Code.

### D. One–Year Contractual Limitation Period

¶ 30 Fourth, Softsolutions contends the district court erred in refusing to vacate or modify the award because the arbitrator essentially modified, subtracted from, and added to the terms of the Agreement by finding that the parties waived paragraph 12.5 of the Agreement, which terminated all of BYU's claims not brought within one year after discovery of the cause of action. Specifically, Softsolutions argues that because BYU brought the arbitration action on February 4, 1994, all royalties accruing before February 1993 should be barred by the one-year limitation period, as mandated by paragraph 12.5 of the Agreement, and that in finding that the parties waived the one-year provision, the arbitrator improperly disregarded paragraph 20.6 of the Agreement, which explicitly requires all modifications or waivers of the Agreement to be in writing.

¶ 31 The Agreement provided: "No action, regardless of form, arising out of the transaction subject of this Agreement may be brought by either party more than one year after the cause of action is discovered." The Agreement further said: "No modification or claimed waiver of any of the provisions of this Agreement shall be valid unless in writ-

ing and signed by authorized representatives of the party against whom such modification or waiver was sought to be enforced." Moreover, paragraph 15.1 of the Agreement provides that the arbitrator "shall have no power to add to, subtract from or modify any of the terms or conditions of this Agreement."

¶ 32 The parties' Submission Agreement charged the arbitrator with determining whether "BYU's claims for royalties due [were] barred by a contractual limitation period[.] If so, what is the period and when does it begin to run?" In answering this question and in determining the amount of earned royalties, the arbitrator found that the parties, by their own conduct, had waived the one-year contractual limitation period. The arbitrator stated:

> [T]he contractual limitation period was waived by BYU and Softsolutions because of their ongoing negotiations to resolve the written complaints raised by Softsolutions. It was evident to the arbitrator from the evidence, exhibits, testimony and the conduct of the witnesses that the contractual limitation period should not bar BYU from collecting royalty payments that are found to be due and owing.

The arbitrator did not address the written waiver requirement of paragraph 20.6.

¶ 33 In determining whether to vacate the award based on this alleged error, the district court applied the two-pronged test in *Buzas*. The court determined that the first prong in *Buzas* was met because the parties submitted the contractual limitation issue to the arbitrator. We agree that the court did not exceed its authority on this basis. In considering the second prong of *Buzas*, whether the arbitrator's actions were "without foundation in reason or fact," the district court said:

> The court recognizes the standard set forth in *Buzas* is that the *arbitrator* cannot add to, subtract from or modify any terms of the License Agreement. In this case, however, the arbitrator found that the parties (BYU and Softsolutions) *themselves* by their own conduct modified/waved [sic] the License Agreement, and this court may not substitute its own judgment for that of the arbitrator. The court does not read

*Buzas* to hold that if the parties themselves modify the License Agreement by their conduct, the arbitrator must ignore such conduct in favor of express contractual language. Additionally, by the language of *Buzas* it would not be irrational or inconsistent with the wording of the License Agreement for the arbitrator to conclude/interpret that paragraph 20.6 is capable of being modified by the parties themselves. The arbitrator is charged with interpreting the contract, and it was not irrational or inconsistent with the License Agreement as modified by the conduct of the parties to find that the limitation period had been waived by BYU and Softsolutions.

■ ¶ 34 Hence, the issue we must determine is whether the court's finding of waiver, in light of the provision requiring waivers to be in writing, is irrational as a matter of law, and thus requires us to vacate the award because the arbitrator exceeded his authority. We conclude that the district court correctly concluded that the arbitrator acted rationally. Here, the arbitrator did not subtract from, add to, or modify the Agreement, which would certainly be improper. Rather, the arbitrator interpreted the contract as permitting the parties *themselves* to modify/waive the contractual limitation period, despite the express contractual language to the contrary. We do not find this interpretation of the Agreement to be irrational or inconsistent with the law in this state. *See Provo City Corp. v. Nielson Scott Co.,* 603 P.2d 803, 806 (Utah 1979) ("It is true that parties to a written contract may modify, waive, or make new contractual terms, even if the contract itself contains a provision to the contrary."); *see also Ted R. Brown & Assocs. v. Carnes Corp.,* 753 P.2d 964, 968 (Utah Ct.App.1988) (parties to a contract may, by mutual consent, modify any or all of the contract, even if the contract contains provision to the contrary). As such, the district court did not err in refusing to vacate the award. Moreover, because this matter was submitted by both parties for decision as reflected by the Submission Agreement, the district court properly denied Softsolutions' modification request.

### E. Automatic Termination of the Agreement

¶ 35 Fifth, Softsolutions argues that the district court erred in refusing to vacate or modify the award because the arbitrator erroneously awarded royalties on software sales made after the Agreement had automatically terminated by its own terms. Specifically, Softsolutions argues that the Agreement automatically terminated under paragraph 14.2D and E, on January 24, 1994, if not earlier, and by awarding royalties on sales after this date, the arbitrator blatantly exceeded his powers.

¶ 36 Paragraph 14.2 provides:

This Agreement shall be terminated automatically in the event of occurrence of any one of the following circumstances:

. . .

D. In the event Softsolutions shall cease to carry on its business; or

E. In the event that there is a transfer or sale of the Softsolutions' business purporting to transfer or assign this Agreement or licensed technology without the prior express written consent of BYU; except as otherwise permitted herein.

¶ 37 The arbitrator did not explicitly address the automatic termination provision of 14.2 in making the arbitration award. However, in assessing whether the award should be vacated, the district court stated that the first prong of the *Buzas* test was met because the arbitrator was charged with determining the amount of royalties Softsolutions owed BYU as well as determining whether the use of D–Search was discontinued so that royalties stopped accruing. In essence, the district court determined that an award which included royalties for periods before and after January 24, 1994, fit squarely within the Submission Agreement. We agree.

¶ 38 In addressing the second prong of *Buzas*, the district court recognized that the arbitrator did not give detailed reasons on this issue, but indicated that in arbitration law, arbitrators are not required to provide detailed reasons for every facet of their award. We agree. The court determined that the arbitrator did not act irrationally or inconsistently with paragraph 14.2D of the Agreement because the arbitrator could have found that the stock sale of STC to WordPerfect did not mean STC "ceased to carry on business" under 14.2D. This is a rational interpretation.

¶ 39 With respect to Softsolutions' claim that the arbitrator exceeded his authority by disregarding paragraph 14.2E, given the sale of Softsolutions' business, STC, which purported to transfer or assign the licensed technology to WordPerfect without BYU's consent, the court found that the arbitrator did not act irrationally or inconsistently. It based its ruling on the following rationale: (1) The arbitrator could have reasonably found a violation of paragraph 14.5 in that STC failed to return D–Search after the stock sale to WordPerfect, (2) paragraph 14.2 (the automatic termination provisions) must be viewed in context with paragraph 14.5 (requiring the return of D–Search in the event of termination), (3) BYU had no notice of the stock sale because of the violation of paragraph 14.5, and therefore (4) Softsolutions cannot claim termination under 14.2E to avoid royalty payments, yet exclusively possess D–Search in violation of paragraph 14.5 of the Agreement. We conclude that this analysis also meets the test of reasonability and rationality under *Buzas*. As such, the district court did not err in refusing to vacate the award on this basis. Furthermore, because the issue of earned royalties was submitted for decision, the court properly refused to modify the award.

## II. ATTORNEY FEES

¶ 40 Softsolutions appeals BYU's award of attorney fees. Specifically, Softsolutions contends that attorney fees are non-recoverable as a matter of law because BYU was represented by in-house counsel, and even if the fees are recoverable, they are excessive and unreasonable. As a threshold matter, we consider whether this issue was properly preserved for appeal. BYU argues that the issue of the recoverability of fees for an in-house attorney was not raised below and should be summarily rejected. BYU argues that Softsolutions raised only the issue of reasonableness and excessiveness of the at-

torney fee award in its complaint for declaratory judgment. However, in Softsolutions' objection to the form of proposed judgment, Softsolutions raised the issue of whether "attorney fees may be awarded to in-house counsel." The district court specifically addressed this issue, concluding that

> in-house counsel is entitled to charge the same rates as independent outside counsel for similar litigation because there has been no persuasive evidence presented which would indicate that the operation of in-house counsel does not incur similar overhead expenses. In addition, the court finds no compelling reason as to why BYU should not be entitled to attorney's fees at a rate which it would have cost BYU to litigate this matter with comparable outside counsel had they had to hire such, especially when the contract, controlling statutes, and case law support such an award.

As such, this issue is properly before us.

### A. In–House Counsel Fees

¶ 41 "In Utah, attorney fees are awardable only if authorized by statute or by contract." *Dixie State Bank v. Bracken,* 764 P.2d 985, 988. If a contract provides for attorney fees, the award "is allowed only in accordance with the terms of the contract." *Id.* In this case, the parties' Agreement provided for "reasonable attorney fees."[3] Attorney fees are also authorized by the Utah Arbitration Act, section 78–31a–16 of the Utah Code.[4]

¶ 42 Softsolutions maintains that our decisions in *Jones, Waldo, Holbrook & McDonough v. Dawson,* 923 P.2d 1366 (Utah 1996), and *Smith v. Batchelor,* 832 P.2d 467 (Utah 1992), prohibit awarding attorney fees to BYU because BYU was represented by in-house counsel. Essentially, Softsolutions argues that our decisions in *Jones, Waldo* and *Batchelor* stand for a blanket prohibition of attorney fee awards to pro se litigants, thus precluding BYU from obtaining attorney fees as a matter of law.

¶ 43 In *Batchelor,* we held that a pro se attorney-litigant is not entitled to recover attorney fees for successful litigation. *See Batchelor,* 832 P.2d at 473. Likewise in *Jones, Waldo,* we held that a pro se law firm-litigant could not recover attorney fees in enforcing an agreement. *See Jones, Waldo,* 923 P.2d at 1375. In refusing to award attorney fees in these cases, we focused on the important fact that the litigants were both in the business of providing legal services and thus did not "incur" attorney fees as a lay individual or nonlegal organization would. *See Jones, Waldo,* 923 P.2d at 1375 (stating "[i]t is by no means self-evident that the time a lawyer spends on his own case represents fees 'incurred' "). That is, neither the law firm nor the attorney-litigant actually paid or became liable to pay consideration in exchange for legal representation and thus did not incur attorney fees in the action. It was not the fact that they were pro se that precluded them from recovery. Rather, it was the fact that they were lawyers representing themselves, and therefore did not incur attorney fees.

¶ 44 This case is different. BYU is represented in this matter without the aid of outside legal counsel. However, BYU is not an organization primarily engaged in providing legal services, and as such, the issue is whether a nonlegal organization can recover

---

3. The Agreement provided:

> Softsolutions shall also pay all reasonable collection costs at any time incurred by BYU in obtaining payment of amounts past due, including court costs, expenses associated with litigation, and *reasonable attorneys' fees,* whether or not any suit was commenced by BYU.
>
> . . . .
>
> In the event suit or an arbitration proceeding is commenced to construe or enforce any provision of this Agreement, the prevailing party, in addition to all other amounts to which

such party may be entitled, shall be paid by the other party a *reasonable sum for attorneys' fees* and costs.

(Emphasis added.)

4. Section 78–31a–16 provides:

> An award which is confirmed, modified, or corrected by the court shall be treated and enforced in all respects as a judgment. Costs incurred incident to any motion authorized by this chapter, including a reasonable attorney's fee, unless precluded by the arbitration agreement, may be awarded by the court.

attorney fees when it uses the services of salaried in-house counsel. We hold in the affirmative.

¶ 45 There are no prior Utah cases directly on point. However, we are persuaded by the ample authority from other jurisdictions that a successful litigant who is not primarily engaged in providing legal services may recover attorney fees when represented by salaried in-house counsel.[5] Such an award is still limited to those occasions when the contract between the parties, a statute, or other rule of law otherwise entitles a party to recover attorney fees, but removes the previously perceived distinction between in-house and private counsel.

¶ 46 This rule is a reasonable means of compensating an organization for legal expenses it actually incurred, unlike the litigants in *Jones, Waldo* and *Batchelor.* That

is, BYU, as a nonlegal entity, was required to pay consideration for the legal services received from its in-house counsel in the form of salary and other costs of employment. The litigants in *Jones, Waldo* and *Batchelor* did not actually pay or become liable to pay consideration in exchange for representation. We hold that BYU, as the successful party, was entitled to attorney fees for the legal services of its in-house counsel.

### B. Amount of Attorney Fee Award

¶ 47 We now consider Softsolutions' argument that the awarded amount is unreasonable and should be vacated and remanded to the district court to determine a reasonable fee based on the actual salary of counsel and direct overhead costs (cost-plus rate), not on prevailing market rates charged by outside counsel (market rates).

---

Utah Code Ann. § 78–31a–16 (1996).

**5.** *See generally Central States, Southeast & Areas Pension Fund v. Central Cartage Co.,* 76 F.3d 114, 115–16 (7th Cir.1996) (permitting attorney fees to staff attorneys of nonlegal organization); *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania,* 762 F.2d 272, 278 (3d Cir.1985) (permitting award of attorney fees to nonlegal entity represented by in-house counsel despite case law holding pro se litigant ineligible for attorney fees); *Milgard Tempering, Inc. v. Selas Corp. of Am.,* 761 F.2d 553, 557–58 (9th Cir. 1985) (stating attorney fees should be permitted to in-house counsel of nonlegal organization so long as counsel actively participated in matter); *Textor v. Board of Regents,* 711 F.2d 1387, 1396 (7th Cir.1983) (permitting attorney fees for salaried in-house counsel of universities); *National Treasury Employees Union v. United States Dep't of Treasury,* 656 F.2d 848, 853 (D.C.Cir.1981) (permitting award of attorney fees to lay organization utilizing in-house counsel); *National Treasury Employees Union v. Nixon,* 521 F.2d 317 (D.C.Cir.1975) (permitting attorney fees award for services of in-house counsel of union); *Pittsburgh Plate Glass Co. v. Fidelity & Cas. Co.,* 281 F.2d 538, 542 (3d Cir.1960) (permitting attorney fee award to glass company when litigation was conducted in part by in-house attorneys); *PPG Indus., Inc. v. Celanese Polymer Specialties Co.,* 840 F.2d 1565, 1570 (Fed.Cir.1988) (permitting attorney fee award to nonlegal corporation when litigation conducted in part by in-house counsel); *Goodrich v. Department of Navy,* 733 F.2d 1578, 1579 (Fed.Cir.1984) (permitting attorney fee award when lawyer was employed by union); *Holmes v. NBC/GE,* 168 F.R.D. 481, 482 n. 3 (S.D.N.Y.1996) (permitting award of attorney fees for nonlegal entity's in-house counsel); *Scott Paper Co. v. Moore Bus. Forms, Inc.,* 604 F.Supp.

835, 837 (D.Del.1984) (permitting award of attorney fees for services by paper company's in-house counsel); *Brisbane v. Port Auth.,* 550 F.Supp. 222 (S.D.N.Y.1982) (permitting attorney fees to port authority for work by in-house counsel); *Consumers Union of United States, Inc. v. Board of Governors of Fed. Reserve Sys.,* 410 F.Supp. 63, 65 (D.D.C.1975) (granting attorney fees to non-profit consumer educational organization when litigation was conducted by in-house salaried attorneys); *B–E–C–K Constructors, Inc. v. State,* 604 P.2d 578, 585 (Alaska 1979) (stating "where a party is represented by both private counsel and in-house counsel who actively participate in the preparation of the case, the party may recover partial fees for both private and in-house counsel"); *Trope v. Katz,* 11 Cal.4th 274, 45 Cal.Rptr.2d 241, 902 P.2d 259, 271 (1995) (recognizing modern trend to allow attorney fees to litigant represented by in-house counsel); *In re Trust Known as Great N. Iron Ore Properties,* 311 N.W.2d 488, 492–94 (Minn.1981) (permitting attorney fee award to nonlegal entity for services of in-house counsel); *Dale Elec., Inc. v. Federal Ins. Co.,* 205 Neb. 115, 286 N.W.2d 437, 443 (1979) (permitting attorney fee award to electronics company using in-house counsel); *Tesoro Petroleum Co. v. Coastal Ref. & Mktg., Inc.,* 754 S.W.2d 764, 766–67 (Tex.Ct.App.1988) (concluding award of attorney fees for services of coastal refining corporation's in-house counsel was proper and did not violate public policy or code of professional responsibility); 20 Am.Jur.2d *Costs* § 59 (1999) (recognizing attorney fee award to in-house counsel). *But see Burger King Corp. v. Mason,* 710 F.2d 1480, 1499 & n. 13 (11th Cir.1983) (dictum implied all attorney fees clauses under Florida law are indemnification provisions and do not include payment for in-house counsel expenses).

¶ 48 In this case, the arbitrator awarded BYU $115,000 in attorney fees based upon a $150 per hour market rate. The district court agreed and awarded BYU an additional $28,987.50 for post-arbitration litigation, also based upon a $150 per hour rate. In determining a reasonable award of attorney fees, both the arbitrator and the district court considered the factors enumerated in *Dixie State Bank v. Bracken,* 764 P.2d 985, 990.[6]

¶ 49 Like the district court, BYU maintains that most courts have endorsed an award of attorney fees to in-house counsel by computing the value of their services in the same manner as fees are computed for outside counsel; that is, fair market value for similar services from a comparably experienced outside lawyer. By contrast, Softsolutions argues that if any fees should be awarded, a cost-plus rate should apply.

¶ 50 In *Dixie,* we did not draw the narrow distinction between a reasonable fee award based upon the use of in-house or outside counsel, and we have yet to address this issue in other cases. Indeed, in *Dixie* we held that in computing a reasonable attorney fee, a district court should consider, among other things, whether the billing rate is consistent with the rate customarily charged in the locality for similar services and that it should consider any other circumstances which it deems necessary. *See Dixie,* 764 P.2d at 990.

¶ 51 Courts that have considered what is a reasonable attorney fee award for services of in-house counsel have, in some cases, awarded fees using a cost-plus rate.[7]

Other courts have employed a market-rate formula.[8] We are convinced that a cost-plus rate is the more reasonable measure of attorney fees to in-house counsel, and is consistent with the public policy that the basic purpose of attorney fees is to indemnify the prevailing party and not to punish the losing party by allowing the winner a windfall profit. *See Jones, Waldo,* 923 P.2d at 1375 (indicating attorney fee awards are means to "'vindicate personal claims'" rather than means to "'generate fees'" (quoting *Falcone v. Internal Revenue Serv.,* 714 F.2d 646, 648 (6th Cir.1983))).

¶ 52 To assist the district court on remand, we set forth general guidelines to be considered in making such an award. Fees for in-house counsel are limited to consideration actually paid or for which the party is obligated, calculated using a cost-plus rate and taking into account (1) the proportionate share of the party's attorney salaries, including benefits, which are allocable to the case based upon the time expended, plus (2) allocated shares of the overhead expenses, which may include the costs of office space, support staff, office equipment and supplies, law library and continuing legal education, and similar expenses. *See Lacer,* 687 P.2d at 404. The party seeking recovery of fees has the burden of proving these amounts.

¶ 53 Turning to the case at hand, we draw a distinction between the attorney fees awarded by the arbitrator and reviewed by the district court, and those fees awarded by the district court for post-arbitration proceedings. The scope of review differs.

---

6. In *Dixie,* we stated that in determining a reasonable fee a district court should find answers to four questions:
   1. What legal work was actually performed?
   2. How much of the work performed was reasonably necessary to adequately prosecute the matter?
   3. Is the attorney's billing rate consistent with the rates customarily charged in the locality for similar services?
   4. Are there circumstances which require consideration of additional factors, including those listed in the Code of Professional Responsibility?
   764 P.2d at 990 (footnotes omitted).

7. *See, e.g., PPG,* 840 F.2d at 1570; *Goodrich,* 733 F.2d at 1579; *NTEU,* 656 F.2d at 853; *Lacer v.*

*Navajo County,* 141 Ariz. 392, 687 P.2d 400, 404 (Ct.App.1984).

8. *See, e.g., Central States,* 76 F.3d at 115–16; *Milgard,* 761 F.2d at 558 (indicating modern trend is to award attorney fees for in-house counsel based on the "market rate"); *Environmental Defense Fund v. EPA,* 672 F.2d 42, 50 (D.C.Cir. 1982); *see also Blum v. Stenson,* 465 U.S. 886, 892–96, 104 S.Ct. 1541, 1545–47, 79 L.Ed.2d 891 (1984) (indicating reasonable attorney fees under federal statute are to be calculated according to prevailing market rates in relevant community, not according to cost of providing legal services, regardless of whether prevailing party is represented by private profit-making attorneys or non-profit legal aid organizations).

¶ 54 We look first to the arbitrator's award of attorney fees, totaling $115,000. In *Buzas* we stated that the role of a district court and this court in the review of an arbitrator's factual finding is severely limited. *See Buzas Baseball, Inc. v. Salt Lake Trappers, Inc.*, 925 P.2d 941, 948 (indicating trial court "does not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts"). Indeed, "whether the [district or this] court agrees with the arbitrator's judgment is irrelevant, as long as the arbitrator construed and applied the [attorney fees provision of the] contract in an arguably reasonable manner and acted within the scope of his authority." *Intermountain Power Agency v. Union Pac. R.R. Co.*, 961 P.2d 320, 323. Because the issue of attorney fees was clearly submitted to the arbitrator, and because the arbitrator reasonably applied the attorney fee provisions in the Agreement and acted within the authority delegated to him by the parties, we will not disturb this portion of the award.

¶ 55 Next, we turn to the district court's award of post-arbitration attorney fees totaling $29,987.50. We review the district court's award of attorney fees under an abuse of discretion standard. *See Dixie*, 764 P.2d at 991. Because the district court did not apply the rule of law relating to the proper measure of attorney fees recoverable by a nonlegal organization for the use of in-house counsel, we vacate that portion of the attorney fees award and remand the case to the district court to redetermine post-arbitration attorney fees for in-house counsel consistent with this opinion.

¶ 56 Finally, we address BYU's request for attorney fees on appeal. BYU has prevailed in this action, and therefore, we award it reasonable attorney fees incurred in this appeal, the amount to be determined by the trial court on remand, using the cost-plus rate.

## CONCLUSION

¶ 57 In sum, we affirm the district court's denial of Softsolutions' motion to vacate or modify the arbitration award, and grant of BYU's motion to confirm the arbitration award. Moreover, we hold that attorney fees are recoverable for the services of in-house counsel of nonlegal entities when otherwise provided for by contract, statute, or other rule of law. The district court properly concluded that attorney fees were recoverable in this instance for the services performed by BYU's in-house counsel. Although the arbitrator did not calculate attorney fees under a cost-plus rate, given the trial court and this court's narrow scope of review on this issue, we do not disturb the arbitrator's attorney fee award. However, given our broader scope to review the trial court's post-arbitration fee award, we hold that the court exceeded its discretion in computing the attorney fee award by using a market-rate formula rather than a cost-plus rate. As such, we vacate that portion of the attorney fee award and remand to the district court for the limited purpose of calculating post-arbitration attorney fees, including those fees incurred on appeal, in accord with this opinion.

¶ 58 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Judge ORME concur in Justice WILKINS' opinion.

¶ 59 Having disqualified himself, Justice DURRANT does not participate herein; Court of Appeals Judge GREGORY K. ORME sat.