LOUIS PACINI *et al.*, Plaintiffs and Counterdefendants-Appellants, v. ANGELO S. REGOPOULOS *et al.*, Defendants and Counterplaintiffs-Appellees.

First District (3rd Division)   No. 1—94—4445

Opinion filed May 1, 1996.

Patrick J. Keenan, of Sklodowski, Franklin, Puchalski & Reimer, of Chicago, for appellants.

Alan T. Schencker, of Grant & Schencker, of Northbrook, for appellees.

JUSTICE CERDA delivered the opinion of the court:

Plaintiffs, Louis Pacini, Lois Pacini, and La Salle National Bank, as trustee under trust No. 111927, filed a complaint against defendants, Angelo Regopoulos, Efstathios Regopoulos, and Joseph Navilio, alleging breach of an occupancy guaranty included in an agreement to purchase a shopping center. Defendants filed a counterclaim seeking specific performance of a junior mortgage agreement, foreclosure of an equitable mortgage lien, and damages. At the close of plaintiffs' case in chief, the trial court entered a directed finding in favor of defendants on plaintiffs' complaint and judgment in favor of defendants on their counterclaim. Without taking any further evidence, the trial court then entered an equitable mortgage lien against the property and personal judgments against each plaintiff in the amount of the lien.

On appeal, plaintiffs assert that the trial court erred when it (1) directed a finding in favor of defendants; (2) entered judgment for defendants on their counterclaim; and (3) entered personal judgments against plaintiffs.

The principle issue in this case is whether the doctrine of *de minimis non curat lex* applied where a rental occupancy guaranty agreement required 95% occupancy and the evidence only proved 94.9953% rental occupancy.

On May 12, 1988, plaintiffs entered into a purchase agreement with defendants to buy a shopping center. Included in the agreement was a guaranty of occupancy, which provided that defendants would guarantee an income stream from 95% of the rentable square footage. The sale closed on July 28, 1988, at which time plaintiffs and defendants entered into an assignment and assumption of leases, which included a provision whereby defendants would indemnify plaintiffs for claims arising from any lease and occurring prior to the closing.

As part of the sales transaction, plaintiffs assumed a first mortgage that was held by Crown Life Insurance Company for $4.5 million. Pursuant to the assumption of the first mortgage, $900,000 of the seller's loan proceeds were held in escrow under a rent holdback agreement. The parties also executed a junior mortgage agreement whereby they would enter into a second mortgage, also known as a junior mortgage, if Crown applied any portion of the holdback funds to the unpaid principal.

In May 1989, Crown applied $600,000 of the holdback funds to reduce the unpaid balance of the first mortgage owed by plaintiffs. At that time, defendants drafted and tendered a junior mortgage and promissory note to plaintiffs' attorney, but the junior mortgage docu-

ments were never executed. Instead, plaintiffs filed a complaint alleging that defendants had breached the occupancy guaranty. They claimed a substantial setoff on the junior mortgage's amount on the grounds that the 95% occupancy rate had never been attained.

Defendants filed a counterclaim alleging that plaintiffs had breached the junior mortgage agreement. They sought specific performance of the junior mortgage agreement or, in the alternative, an equitable mortgage lien on the property and personal judgments against plaintiffs.

At trial, plaintiff Louis Pacini testified that the 95% occupancy rate was never reached in the shopping center and that the post-occupancy vacancy rate had been as low as 67%. At the time of the closing, when he purchased the property, he estimated that the occupancy rate was around 92%, with six vacancies, and by October 1, 1988, with four vacancies, it was 94.38%.

Michael O'Connor, a licensed professional land surveyor, testified on plaintiffs' behalf. He evaluated the retail square footage of the shopping center in March 1993 and prepared a survey. He determined that the occupancy rate at the time of closing, without the six vacant units, was 93.384%. On October 31, 1988, without four vacant units, the occupancy rate was 94.9953%.

At the conclusion of plaintiffs' evidence, the trial court found that the 95% threshold had been met and granted a directed finding in favor of defendants. The trial court applied the doctrine of *de minimis non curat lex*, where the court gives no remedy for slight harm. 4 A. Corbin, Corbin on Contracts § 946, at 813 (1951). On defendants' counterclaim, the trial court stated that it would not direct plaintiffs to execute the junior mortgage and note, but found that there was an equitable mortgage lien. The trial court also entered personal judgments against each plaintiff in the amount of the equitable mortgage lien.

The first issue is whether the trial court erred in directing a finding in favor of defendants on plaintiffs' claim. Plaintiffs assert that the evidence they presented during their case in chief established a *prima facie* case since their evidence showed that less than 95% of the shopping center was leased on the day of the closing.

■ Pursuant to section 2—1110 of the Illinois Code of Civil Procedure (735 ILCS 5/2—1110 (West 1994)), the defendant may move for a directed finding at the end of the plaintiff's case in any matter tried without a jury. *Kokinis v. Kotrich*, 81 Ill. 2d 151, 154, 407 N.E.2d 43 (1980); *Illinois Health Care Ass'n v. Wright*, 268 Ill. App. 3d 988, 994, 645 N.E.2d 1370 (1994). When ruling on the motion, the trial court must employ a two-step analysis. First, the trial court must determine

whether the plaintiff has established each element of a *prima facie* case. *Kokinis*, 81 Ill. 2d at 155. To establish a *prima facie* case, the plaintiffs must present evidence to support each element of the cause of action. *Illinois Health Care Ass'n*, 268 Ill. App. 3d at 995.

If the trial court finds that the plaintiff has not established a *prima facie* case, it should direct a finding in favor of the defendant. *Kokinis*, 81 Ill. 2d at 155; *Illinois Health Care Ass'n*, 268 Ill. App. 3d at 994. If, however, the trial court finds that plaintiff has established a *prima facie* case, it proceeds to the second step of the analysis, which is to weigh all the evidence, including any evidence favorable to the defendant, assess the credibility of the witnesses, and generally consider the weight and quality of all the evidence. *Kokinis*, 81 Ill. 2d at 154; *Illinois Health Care Ass'n*, 268 Ill. App. 3d at 994. In deciding a motion for a directed finding, the trial court is not to view the evidence in the light most favorable to the plaintiff. *Kokinis*, 81 Ill. 2d at 154.

If the weighing process results in the negation of some of the evidence necessary to the plaintiff's *prima facie* case, the court should grant the defendant's motion and enter judgment in his favor. *Kokinis*, 81 Ill. 2d at 154-55; *Klemp v. Hergott Group*, 267 Ill. App. 3d 574, 578, 641 N.E.2d 957 (1994). In contrast, if sufficient evidence establishing the plaintiff's *prima facie* case remains after the weighing process, the court should deny the defendant's motion and proceed as if the motion had not been made. *Kokinis*, 81 Ill. 2d at 154-55; *Klemp*, 267 Ill. App. 3d at 578.

Applying those principles to the record, we determine that the issue is not whether plaintiffs presented a *prima facie* case, but whether the trial court properly weighed all the evidence. A trial court's determination on the motion will not be reversed on appeal unless the decision is contrary to the manifest weight of the evidence. *Kokinis*, 81 Ill. 2d at 154.

Plaintiffs assert that the trial court should not have applied the doctrine of substantial performance when it found that defendants had satisfied the 95% occupancy rate. Not only do they claim that they are entitled to strict compliance with the contract, but they also contend that an occupancy rate that is deficient by less than one percent is not trivial. Since the contract provided that defendants were required to pay $12 per square foot for each square foot needed to produce an income stream reflecting 95% occupancy until the 95% was achieved and plaintiffs maintain that the 95% occupancy rate never occurred, they calculate that the small deficiency resulted in substantial payment requirements by defendant sellers.

In response, defendants argue that plaintiffs received rental

income from defendants until the abatement period ended and the 95% occupancy rate was reached in October 1988, as required by the purchase agreement. Defendants contend that the 95% rate was achieved if the numbers are not taken to the fourth decimal place and that a 95%, not 95.0000%, occupancy rate was required. Defendants further argue that O'Connor used an arithmetic formula during his measurements that was more precise than the parties had contemplated. When asked to take his numbers to a tenth or hundredth, O'Connor stated that the occupancy rate would be 95%.

Contrary to plaintiffs' assertion, this case does not involve substantial performance, but the doctrine of *de minimis non curat lex*, which was properly used by the trial court. Generally, there must be strict compliance with the contract's terms. Substantial performance is not enough. However, substantial performance is different from the doctrine of *de minimis non curat lex*, which means that courts will not regard trifles.

■ Failure to perform any term of a contract, no matter how minor, is a breach of contract and the nonperforming party is liable for damages resulting from a material breach. *Borys v. Rudd*, 207 Ill. App. 3d 610, 618, 566 N.E.2d 310 (1990); 4 A. Corbin, Corbin on Contracts § 946, at 809 (1951).

Corbin states as follows:

> "For any breach of contract, an action lies; any breach is material enough for that, although if no substantial injury is shown the damages recoverable are only nominal. *** If a contractor's failure of performance causes such slight harm that the courts will give no remedy therefor, adopting and applying the maxim *de minimis non curat lex*, it is proper to say that there has been no breach of duty." 4 A. Corbin, Corbin on Contracts § 946, at 813 (1951).

There are few Illinois cases that involve the doctrine of *de minimis non curat lex*, but it continues to be recognized in Illinois. *Urban v. Village of Inverness*, 176 Ill. App. 3d 1, 14, 530 N.E.2d 976 (1988) (Murray, J., concurring in part and dissenting in part). One case that applied the doctrine is *Smith Oil & Refining Co. v. Department of Finance*, 371 Ill. 405 (1939), where the Department of Finance wanted to tax the amount of oil that incidentally entered into the casting as carbon during the manufacturing process. A chemist testified that the amount of carbon absorbed by the iron would be so small that it would be difficult to prove by a chemical analysis that any absorption actually took place. In his opinion, the increase in the carbon content of the casting resulting from the absorption from the core oil would be less than one-half of one per cent. The court agreed with the ap-

pellant's argument that such a small percentage of the oil entered into the finished product that the principle of *de minimis non curat lex* applied. The court held that the amount of carbon added was insignificant.

The doctrine was also applied in the case of *Swick v. City of Chicago*, 11 F.3d 85 (7th Cir. 1993). In that case, Swick, a Chicago police officer, was placed on involuntary sick leave. His income was not diminished because he received the same amount of money for sick pay. But he was required to turn in his badge and gun and could not wear his uniform or exercise the powers of a police officer. Swick brought a due process action against the City of Chicago for deprivation of property. The court stated:

> "The maximum *de minimis non curat lex* retains force even in constitutional cases, even in civil rights cases. [Citation.] Its particular function is to place outside the scope of legal relief the sorts of intangible injuries normally small and invariably difficult to measure that must be accepted as the price of living in society rather than made a federal case out of." *Swick*, 111 F.3d at 87.

The *Swick* court held that the injury suffered by the police officer "is of this character" and affirmed the dismissal of his complaint.

Similarly, in this case, we apply *de minimis non curat lex* and find no breach of the occupancy guaranty. Defendants guaranteed an income stream from 95% of the rentable square footage based on the leases in the rent roll. The occupancy guaranty provided as follows:

> "Seller hereby guarantees to Purchaser an income stream from ninety-five (95%) percent of the rentable square footage of retail space in the Project as of the date of Closing based on the leases identified in the Rent Roll. The foregoing guarantee shall be subject to the following conditions:
>
> (i) if a tenant identified in the Rent Roll vacates space in the Building, causing occupancy to fall below ninety-five (95%) percent, Seller guarantees payment of an amount equal to the rental rate payable by the tenant under the tenant lease for such vacated space, but only for the term of such lease;
>
> (ii) if the lease for a tenant identified in the Rent Roll provides for abatement of rentals causing the income stream for the Building to be less than the income stream assuming ninety-five (95%) percent occupancy, then Seller shall pay an amount equal to the rental rate payable by the tenant for the period of abatement;
>
> (iii) if less than ninety-five (95%) percent of the Building is leased at the Closing, then Seller guarantees payment in an amount equal to $12.00 per square foot for each square foot necessary to produce an income stream for the Building reflecting ninety-five (95%) percent occupancy, but only for such time as the Building is less than ninety-five (95%) percent occupied.

Notwithstanding anything herein to the contrary, Seller's guarantee shall terminate at any time ninety-five (95%) percent of the rentable square footage in the Project is leased and all abatement periods under tenant leases identified in the Rent Roll have expired."

■ Applying the doctrine of *de minimis non curat lex,* we hold that the 94.9953% occupancy rate is essentially a 95% occupancy rate. As a result, the guaranty ended in October 1988 when the occupancy rate reached 94.9953% and the abatement periods ended. At that point, defendants no longer were required to guarantee an income stream from 95% of the rentable square footage. Thus, the directed finding in favor of defendants on plaintiffs' complaint was proper.

The next issue is whether entry of judgment against plaintiffs/counterdefendants on the counterclaim was proper. Plaintiffs/counterdefendants assert that their due process rights were violated because they were not allowed to present a defense to the counterclaim. Even though they had earlier agreed that the evidence heard during their case in chief would be used in the counterclaim, plaintiffs/counterdefendants argue that they did not agree to a procedure where they would not be allowed to present additional evidence and argument in defense of the counterclaim.

The trial court may have erred in directing a finding on the counterclaim in favor of defendants/counterplaintiffs without any defense by plaintiffs/counterdefendants. A defendant is deprived of the protection of her day in court when she is not given the opportunity to be heard in her defense, a basic constitutional principle consistent with the fundamental concept of an equitable judicial system. *Nye v. Parkway Bank & Trust Co.,* 114 Ill. App. 3d 272, 274, 448 N.E.2d 918 (1983).

Prior to trial, both parties agreed that the evidence that would be heard during plaintiff's case in chief would be applied to the counterclaim. That agreed procedure is different than one where the counterclaim would be decided on the basis of only the evidence in plaintiff's case in chief. Based on the record, no such agreement was reached. Plaintiffs believed they should have been given the opportunity to present a defense to the counterclaim.

Nevertheless, we decline to decide this issue in light of our resolution of the remaining issues in this appeal.

■ Because the defendants fulfilled their occupancy guaranty, they did not have to make any further guaranty payments to plaintiffs. There was no setoff from the occupancy that plaintiffs could apply to reduce the amount they owed on the junior mortgage.

Crown retained a portion of the sellers' (plaintiffs') holdback funds and properly applied it against the outstanding principal balance of the first mortgage that plaintiffs owed.

We find that plaintiffs breached the junior mortgage agreement, which provided that they would execute a junior mortgage and note. However, breach of the junior mortgage agreement does not require plaintiffs to execute the junior mortgage documents drafted by defendants without negotiation. The junior mortgage agreement provided as follows:

"Should any portion of the Holdback be retained by Crown and applied against the outstanding principal balance of the Crown loan, said amounts shall be reimbursed by Purchasers to Sellers. Upon such occurrence, Purchasers shall execute a Promissory Note (hereinafter referred to as the Promissory Note) payable to Sellers the principal amount of which shall be equal to the Crown loan principal reduction. *** The Promissory Note shall be secured by a Junior Mortgage encumbering Hanover Square Shopping Center which Purchasers shall cause to be executed. The terms of the Junior Mortgage shall be reasonably agreeable to the parties hereto and to the extent possible, shall be consistent with the provisions of the first mortgage of Crown. Purchasers shall have the right to set-off against payments due to Sellers under the Promissory Note or Holdback disbursement an amount equal to deficiencies in the rental guaranty, if any, owed by Sellers to Purchasers pursuant to [the occupancy guaranty] of the Purchase Agreement."

Under the aforementioned terms, plaintiffs were required to execute a junior note and mortgage after negotiation. Although the trial court could have required the parties to negotiate and execute a junior mortgage and note, it did not do so. Instead, the trial court chose to grant an equitable mortgage lien, which we find to be an appropriate remedy.

An equitable mortgage lien operates on specific property and is the right to have property subjected to the payment of a claim. *Uptown National Bank v. Stramer*, 218 Ill. App. 3d 905, 907, 578 N.E.2d 1165 (1991). The essential elements of an equitable lien are an obligation owing and a *res* to which that obligation adheres and which is identified with reasonable certainty. *Uptown National Bank*, 218 Ill. App. 3d at 907.

■ Finally, plaintiffs argue that the entry of personal judgments by the trial court was an improper rewriting of the junior mortgage agreement, which intended that the junior mortgage would carry no personal liability. Plaintiffs also stress that defendants drafted and tendered a junior mortgage and promissory note that name only the

land trustee as mortgagor, with no reference to the individual plaintiffs or designation of plaintiffs as guarantors, makers, or signatories.

We find that the personal judgments were improperly entered. As drafted, the junior mortgage documents name only the land trustee as mortgagor, with no reference to the individual plaintiffs and no designation of plaintiffs as guarantors. Not only was the language relating to guarantors crossed out, but the note's unambiguous language provided for no personal liability. The note states in pertinent part:

"24. **Exculpation**. This Note is executed by Borrower, as Trustee as aforesaid, and is payable only out of the property specifically described in the Mortgage, by the enforcement of the provisions contained in the Loan Documents and out of any other property, security or guaranties given for the indebtedness evidenced hereby; and accordingly:

(a) No personal liability shall be asserted or be enforceable against Borrower personally or against its successors or assigns because of or in respect of this Note, or the making, issue or transfer thereof, all such liability, if any, being expressly waived by each taker and Holder;

(b) In case of default in the payment of this Note, or any installment thereof, the sole remedies of the Holder shall be (i) foreclosure of the Mortgage in accordance with the terms and provisions in the Mortgage set forth, (ii) enforcement of the Assignment and Loan Documents; (iii) enforcement of or realization upon any other property and security given for such indebtedness and/or (iv) enforcement of any obligation or liabilities of the beneficiary or beneficiaries of borrower under any separate agreement;

\* \* \*

(d) Nothing herein contained shall affect or impair the liability or obligation of any guarantor, co-maker or other person who by separate instrument shall be or become liable upon or obligated for any of the indebtedness evidence hereby or any of the covenants or agreements contained in the Loan Documents."

A court may not rewrite a contract between parties. *People ex rel. Illinois State Scholarship Comm'n v. Harrison*, 67 Ill. App. 3d 359, 384 N.E.2d 947 (1978). In order for there to be a contract between parties, there must be a meeting of the minds or mutual assent as to the terms of the contract. *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 313, 515 N.E.2d 61 (1987). If there is no ambiguity, the contract language alone establishes the intention of the parties. *Alden Nursing Center of Poplar Creek, Inc. v. Meditrust of Il-*

*linois, Inc.*, 249 Ill. App. 3d 406, 410, 618 N.E.2d 1088 (1993); *Cohen v. Continental Illinois National Bank & Trust Co.*, 248 Ill. App. 3d 188, 194, 618 N.E.2d 1060 (1993).

Applying those principles to the record, we conclude that the personal judgments entered against plaintiffs were against the weight of the evidence. Accordingly, those personal judgments are reversed.

Based on the foregoing, we affirm the directed finding in favor of defendants on plaintiffs' complaint and entry of the equitable mortgage lien but reverse the personal judgments against plaintiffs.

Affirmed in part; reversed in part.

RIZZI, P.J., and TULLY, J., concur.