SIXTH DIVISION

December 15, 2000

No. 1-99-2163

WILLIAM KIPNIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County.

)

v. ) No. 98 CH 5615

)

MANDEL METALS, INC., ) The Honorable

) 
 Dorthy Kirie Kinnaird
,

Defendant-Appellee. ) Presiding Judge.

JUSTICE BUCKLEY delivered the opinion of the court:

This action arises from an employment contract dispute.  In October 1990, Richard Mandel, acting on behalf of defendant, Mandel Metals, Inc. (MMI), entered into a contract with plaintiff William Kipnis.  The contract gave Kipnis a 25% interest in the sale of one or more of MMI's divisions, should such division(s) be sold.  Alternatively, the contract gave Kipnis the right to make a 
bona fide
 offer to purchase such division(s).  MMI would then have the option to accept or reject Kipnis' offer.  In the latter case, MMI would pay Kipnis an amount equal to 25% of the gain MMI would have realized had it accepted Kipnis' offer.  In March 1998, MMI rejected Kipnis' offer, concluding that it was not a "
bona fide
 offer" pursuant to the employment agreement.  In April 1998, Kipnis filed a complaint for declaratory judgment and specific performance against MMI.  The complaint sought a declaration that Kipnis' offer constituted a 
bona fide
 offer pursuant to the employment agreement.  Alternatively, the complaint sought a declaration that MMI breached the employment agreement by refusing to provide Kipnis with appropriate financial information necessary to formulate a 
bona fide
 offer.  In June 1999, the trial court granted summary judgment in MMI's favor, rejecting both of Kipnis' arguments.  Kipnis raises the same arguments on appeal.  We reverse.

I. BACKGROUND

In 1982, MMI hired Kipnis to work in its scrap metal business.  While employed at MMI, Kipnis helped MMI develop an aluminum distribution business known as the Service Center Group (SCG).  By 1997, SCG constituted one of MMI's two components, while the scrap metal division constituted the second component.  SCG consisted of three subcomponents:  (1) the Service Center Division, which distributes primary aluminum; (2) Lednam (also called the "Subsidiary"), which manufactures blank signs for the traffic industry; and (3) American Aerospace Materials, which sold aluminum to the aerospace industry.  Kipnis operated SCG since its inception and eventually expressed an interest in buying it.  

On October 31, 1990, Kipnis, MMI, and the Subsidiary entered into an employment agreement.  The employment agreement, drafted by MMI, covered a 10-year term (ending November 1, 2000) and established Kipnis' salary, bonus, and severance package.  Additionally, paragraph 4 of the employment agreement provided in pertinent part:

"(a) In the event that Service Center Division and/or the Subsidiary shall be sold, Kipnis shall be paid a sum equal to 25% of the gain from the sale of such division(s), computed as the difference between (a) the agreed value of the Service Center Division and/or the Subsidiary as of November 1, 1990, and (b) the sale price of the Service Center Division and/or subsidiary ***.  The agreed value of the Service Center Division and the Subsidiary as of November 1, 1990, shall be determined by the Corporation's independent accountant and approved by Mandel and Kipnis, and said amounts shall be stated in an [e]xhibit attached hereto.  

(b) Subparagraph (a) shall not apply to any such sale unless Kipnis is a salaried employee of the Corporation at the time of such sale; provided that, (i) if Kipnis' employment shall be terminated by the Corporation without 'cause,' as defined in Paragraph 6, and (ii) Kipnis shall not have violated the Noncompetition Agreement in Exhibit A, then this Paragraph 4 shall apply to any such sale made within 24 months after the termination of his employment."  

Additionally, paragraph 5 provided in pertinent part:

(a) "This [p]aragraph 5 shall apply only

 if (i) the Service Center Division or the Subsidiary, or both, has not been sold on or before November 1, 2000; (ii) Kipnis (representing himself alone or an investor group) submits a 
bona fide
 offer in writing to the Corporation, to purchase, at a cash price pay-able in a lump sum at the closing, the Service Center Division and/or Subsidiary; and such purchase price is either agreed by the Corporation, or is determined, in the manner hereinafter provided, to be equal to or greater than the fair market value of the Service Center Division and/or Subsidiary; (iii) the Corporation rejects such offer.  In such event, Kipnis shall be entitled to receive 25% of the gain which the Corporation would have realized if such sale had been consummated as provided in Paragraph 4.  A 
bona fide
 offer must include evidence of the availability of funds to pay the purchase price.

***

(d) This paragraph 5 shall not apply to any offer submitted by Kipnis unless he is a salaried employee of the Corporation; provided that, (i) if Kipnis' employment shall be terminated by the Corporation without 'cause,' as defined in paragraph 6, and (ii) Kipnis shall not have violated the Noncompetition Agreement in Exhibit A, then this Paragraph 5 shall apply to an offer submitted by Kipnis within 12 months after the termination of his employment."

In sum, paragraphs 4 and 5 collectively provided that, if MMI sold the Service Center Division and/or the Subsidiary within the contractual period, it would pay Kipnis 25% of the gain.  If it did not sell the Service Center Division and/or the Subsidiary, Kipnis could make an offer for it.  MMI then had the option to accept Kipnis' offer or, alternatively, reject Kipnis' offer and pay him an amount equal to 25% of the gain it would have realized had it accepted.  The foregoing was subject to Kipnis' continued employment at MMI.  If Kipnis no longer worked for MMI, he could retain his rights under the employment agreement for only 12 months from the termination date, and only if he was terminated without cause.

On March 25, 1997, MMI terminated Kipnis without cause.  On May 17, 1997, the parties entered into a termination agreement.  The termination agreement acknowledged that MMI terminated Kipnis without cause and preserved his rights under paragraphs 4 and 5 of the employment agreement.  The termination agreement also provided that Kipnis could retain copies of certain financial records, already in his possession, for purposes of exercising his rights under the employment agreement.  The termination agreement did not require MMI to provide other records nor did it expressly limit Kipnis' access to those records in his possession.

In June 1997, Kipnis began requesting information regarding the Service Center Division, advising MMI that such information was necessary to formulate his offer and to obtain financing.  MMI forwarded several balance sheets, reports, and other financial statements to Kipnis.  Kipnis continued to request financial information and, in September 1997, Mandel informed Kipnis that MMI would not release any other documents until Kipnis made a "
bona fide
 offer."  Over the next several months, Kipnis continued to request financial information.  Kipnis also advised Mandel that both Kipnis' investor and lender requested audits and tours of the plant before they would commit financial backing, but Mandel refused access.  MMI continued to take the position that it would provide no further information until it received a 
bona fide
 offer.

On March 10, 1998, Kipnis sent MMI a letter expressing his intention to purchase the Service Center Division and the Subsidiary.  The letter stated that it "constitute[d] *** Kipnis['] for-mal submission of a 
bona fide
 offer" and set forth several terms, including the scope of purchased assets, the calculation of the purchase price, and adjustment for uncollectible receivables and elimination of intercompany receivables.  Kipnis' letter also declared the existence of financial commitments subject to due diligence. 

On March 25, 1998, the 12-month period in which Kipnis could make a 
bona fide
 offer expired.  On March 26, 1998, MMI's counsel sent Kipnis a letter in which it determined that the March 10, 1998, letter did not constitute a 
bona fide
 offer as contemplated by para-graph 5(a) of the employment agreement. MMI based its reasoning on several points, including (1) the letter, by its own terms, was not binding on the parties; (2) the letter contained unreasonable con-ditions and ambiguities; (3) the terms set forth in the letter were inconsistent; and (4) Kipnis failed to provide evidence that he had sufficient funds. 

In April 1998, Kipnis filed a complaint for declaratory judg-ment and specific performance against MMI.  The complaint sought a declaration that the March 10, 1998, letter constituted a 
bona fide
 offer pursuant to paragraph 5(a) of the contract.  Alternatively, the complaint sought a declaration that MMI breached the employment agreement by refusing to provide Kipnis with appropriate financial information.  As a remedy for the alleged breach, Kipnis asked the trial court to order MMI to provide such information and to allow Kipnis a reasonable period to submit a 
bona fide
 offer.

In June 1998, MMI filed a motion to strike and dismiss.  The trial court denied MMI's motion and allowed discovery to proceed. 

In March 1999, MMI moved for summary judgment, arguing that the March 10, 1998, letter did not constitute a 
bona fide
 offer and that MMI had no obligation to provide Kipnis with financial infor-mation.  In June 1999, the trial court granted summary judgment in MMI's favor.  In its ruling, the trial court found that the March 10, 1998, letter did not constitute a 
bona fide
 offer.  The trial court essentially based its decision on the same factors MMI iden-tified in the March 26, 1998, letter to Kipnis.  The court further found that no implied duty of good faith and fair dealing required MMI to provide Kipnis with financial information or access to the plant.  To impose such a duty, the trial court concluded, would be tantamount to rewriting the employment agreement.  The trial court further noted that the termination agreement manifested the parties' agreement as to information that Kipnis could retain for purposes of making an offer.  Kipnis then filed the instant appeal. 

II. ANALYSIS

In cases involving summary judgment, the standard of review is 
de novo
.  
Truman L. Flatt & Sons Co. v. Schupf
, 271 Ill. App. 3d 983, 986 (1995).  Summary judgment is appropriate if the evidence shows no genuine issue exists as to any material fact, and the moving party is entitled to a judgment as a matter of law.  735 ILCS 5/2-1005(c) (West 1998); 
Golla v. General Motors Corp.
, 167 Ill. 2d 353, 358 (1995).  On a defendant's motion for summary judgment, plaintiff need not establish its case as it would at trial, but must present some factual basis that would arguably entitle it to judgment.  
Hall v. Burger
, 277 Ill. App. 3d 757, 761 (1996).  Because summary judg­ment is a dras­tic means of dispos­ing of liti­gation, the court has a duty to con­strue the record strictly against the movant and liberally in favor of the nonmoving party.  
Espinoza v. Elgin, Joliet & East­ern Ry. Co.
, 165 Ill. 2d 107, 113 (1995).

A. Whether a 
Bona Fide
 Offer Existed

Kipnis first argues that summary judgment was inappropriate because questions of fact exist as to whether the March 10, 1998, letter constituted a 
bona fide
 offer under the employment agreement.  We disagree.  

As a threshold matter, we note that the employment agreement does not specifically define a "
bona fide
 offer."  Paragraph 5(a) of the employment agreement does, however, require that such an offer be made in writing and must propose a cash price payable in a lump sum at closing.  Further, a "
bona fide
 offer must include evidence of the availability of funds to pay the purchase price."  

In any event, we must recognize that, before we can find that Kipnis made a 
bona fide
 offer, we must first determine whether he made any sort of offer at all.  The trial court answered this question in the negative, finding that the March 10, 1998, letter was simply a letter of intent to enter into further negotiation.  We agree with the trial court.  

For a valid contract to exist, an offer must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain.  
Academy Chicago Publishers v. Cheever
, 144 Ill. 2d 24, 29 (1991).  The March 10, 1998, letter did not meet this requirement.  The letter stated unequivocally that "the provisions contained herein are not binding on the parties unless specifically so stated, except to the extent that they reflect the intent of the parties to enter into further negotiations and to develop a definitive written agreement for the purchase of [a]ssets and the [s]tock, in a form mutually satisfactory to [Kipnis] and [MMI]."  We conclude that such language ren-ders the letter a nonbinding letter of intent.  See 
Quake Construction, Inc. v. American Airlines, Inc.
, 141 Ill. 2d 281, 288 (1990) (holding that letters of intent are not necessarily enforceable unless the parties intend them to be contractually binding).
 Additionally, the March 10, 1998, letter did not provide sufficient evidence that Kipnis had sufficient funds to pay the purchase price, as required under paragraph 5(a) of the employment agreement.  The letter contained a statement that Kipnis would personally pay $400,000 prior to closing.  However, it offered no evidence that Kipnis had, or could obtain, such money.  Similarly, the appended letter from Kipnis' investor, Richard Taxman, stated that he would contribute $1,650,000, yet the letter contained no evidence that Taxman had such money.  Finally, the March 10, 1998, letter contained a preliminary term sheet from the American National Bank.  The first paragraph of the term sheet states, "[t]he following is an outline of preliminary financing terms subject to your comments and due diligence by American National Bank and Trust Company of Chicago. *** Please understand this outline is 
solely for discussion purposes and does not represent a commitment to lend
."  (Emphasis added.)  Based on these facts, we agree with the trial court's conclusion that the March 10, 1998, letter did not constitute a 
bona fide
 offer.

B. Implied Duty of Good Faith

Relying primarily on 
Spircoff v. Spircoff
, 74 Ill. App. 3d 119 (1979), Kipnis next argues that, even if we determine that he failed to submit a 
bona fide
 offer, we should nevertheless reverse because MMI breached its implied duty of good faith.  We agree.  

A covenant of good faith and fair dealing is implied in every contract absent a provision that specifically states otherwise.  
Dayan v. McDonald's Corp.
, 125 Ill. App. 3d 972, 989 (1984).  Even though such a covenant may be absent in the contract's express language, courts must compel performance in accordance with good faith and fair dealing.  
Spircoff
, 74 Ill. App. 3d at 128.

The court in 
Spircoff
 examined this issue under similar circumstances.  There, a brother and sister entered into an agree-ment under which the sister retained ownership over a parcel of land.  However, the brother retained the right to sell the parcel within four years and, if he did so, he would receive $50,000 of the proceeds.  Despite the brother's repeated requests, the sister refused to provide the financial statements necessary to effectuate a sale.  The trial court held that an implied condition of coopera-tion existed between the parties and that such condition required that the sister provide the financial information necessary to secure a purchaser.  
Spircoff
, 74 Ill. App. 3d at 126-27.  On appeal, the court agreed, acknowledging the well-settled rule that every contract contains an implied promise of good faith and fair dealing.  
Spircoff
, 74 Ill. App. 3d at 128.  The court noted that the evidence "established that a statement of income and expenses would be necessary for the type of property in question" and that "a buyer *** would require such information."  
Spircoff
, 74 Ill. App. 3d at 128.  On that basis, the court concluded that the sister breached an implied duty of good faith and fair dealing.    
Spircoff
, 74 Ill. App. 3d at 128.

In the instant case, the trial court rejected Kipnis' reliance on 
Spircoff
.  The court found the facts of 
Spircoff
 inapposite, stating that, "in 
Spircoff
 the parties had entered into a joint venture, thereby triggering an implied duty of cooperation.  No such relationship exists here."  We find that a close reading of 
Spircoff
 fails to support the trial court's conclusion.  The 
Spircoff
 court clearly did not rely on the nature of the parties' relationship but, rather, on the nature of the contract and the inherent necessities connected to the brother's ability to exercise his rights under it.  We agree that an implied duty to cooperate and to act in good faith and fair dealing existed here.  Whenever the cooperation of one party is necessary for the other party's performance, there is an implied condition that such cooperation will be given.  See 6 W. Jaeger, Williston on Contracts §887, at 427-31 (3d ed. 1962). 

MMI contends that Kipnis is asking us to rewrite the employment agreement by adding an implied duty of good faith.  See 
Pacini v. Regopoulos
, 281 Ill. App. 3d 274, 283 (1996) (finding that the court must enforce an agreement as written).  We disagree.  As previously mentioned, a covenant of good faith and fair dealing is implied in 
every
 
contract absent a provision that specifically states otherwise
.  
Dayan
, 125 Ill. App. 3d at 989-90.  Thus, an implied duty already exists.  Additionally, we conclude that such a duty is consistent with the agreement's express terms.

In a related argument, MMI notes that, because the termination agreement allowed Kipnis to retain copies of various financial records, he should be precluded from requesting any others.  We do not read the termination agreement so narrowly.  The termination agreement referred only to documents that Kipnis already had in his possession and stated that he could retain copies.  It did not limit Kipnis' access to those records already in his possession.

MMI also argues that Kipnis forfeited his claim on this issue because he failed to seek a court order requiring MMI to produce financial documents until after the employment agreement expired.  We reject MMI's argument on this point under the circumstances.  See 
Melrose Park National Bank v. Carr
, 249 Ill. App. 3d 9, 17 (1993) (holding that courts should not fault plaintiffs for attempting to avoid litigation).  Further, we note that the employment agreement explicitly stated that "[n]o delay or failure by any party to exercise any right under this [a]greement *** shall constitute a waiver of that or any other right."  

In sum, we hold that an implied duty to cooperate and act in good faith and fair dealing existed in the parties' contract.  The contract specifically stated, 
inter alia
, that MMI's performance would not come due unless Kipnis presented a 
bona fide
 offer.  MMI cannot rely on Kipnis' failure to satisfy this condition when it hindered his performance through uncooperative conduct.  See 
Grill v. Adams
, 123 Ill. App. 3d 913, 918 (1984); 
E.B. Harper & Co. v. Nortek, Inc.
, 104 F.3d 913, 919 (7
th
 1997).

III. CONCLUSION

For the foregoing reasons, we find that the trial court correctly concluded that Kipnis' March 10, 1998, letter did not constitute a 
bona fide
 offer.  However, we reject the trial court's finding that MMI had no duty to disclose financial information that Kipnis required in order to formulate an offer.  We instruct the trial court to enter an order directing MMI to act in a manner con-sistent with its obligations of good faith and fair dealing.  Such a course of conduct must include, without limitation, the production of all documents reasonably necessary to Kipnis to formulate a 
bona fide
 offer.  The trial court shall then provide Kipnis with a reasonable time to formulate a 
bona fide
 offer.

We, therefore, vacate the summary judgment order and remand with instructions.

Remand with instructions.

Campbell, P.J., and O'Brien, J., concur.