2001 UT 91

**DCM INVESTMENT CORPORATION, Plaintiff and Appellant,**

v.

**PINECREST INVESTMENT CO., a Utah limited partnership, G.F.I., Ltd., a Utah limited partnership, Walt Gasser & Associates, Inc., G. Walter Gasser, an individual, Defendants and Appellees.**

Nos. 990717, 990745.

Supreme Court of Utah.

Oct. 19, 2001.

786

Philip R. Fishler, Dennis M. Astill, H. Burt Ringwood, Shawn T. Welch, Salt Lake City, for plaintiff.

Max D. Wheeler, Michael R. Carlston, Rodney R. Parker, Salt Lake City, for defendants.

DURHAM, Justice:

¶1 DCM Investment Corporation (DCM) appeals from an order of summary judgment holding that an assignment to DCM of a debtor's joint venture interest by a bankruptcy court triggered a right of first refusal belonging to the debtor's co-venturer. DCM

contends that the assignment by the debtor as part of a settlement transaction did not constitute a bona fide offer of purchase within the meaning of the joint venture agreement, that the right of first refusal was not properly exercised, and that the district court erred in its valuation of the joint venture interest at $36,102. We affirm.

## BACKGROUND

¶ 2 On May 31, 1984, Sheltered Acquisitions Limited IV (SAL IV), a limited partnership, entered into a joint venture agreement with Pinecrest Investment Company (PIC) to own and operate the Pinecrest Shopping Center in Logan, Utah under the name "Pinecrest Associates." SAL IV provided initial capital of between $500,000 and $600,000 for a fifty-percent interest in the joint venture. At that time, the property was valued at $3,350,000 and was managed by property management entities under the direction of defendant PIC.

¶ 3 On September 3, 1992, Candler & Associates (Candler) obtained a jury verdict of $199,940 against SAL IV and its individual partners in a lawsuit arising out of a dispute over commissions due on the sale of various aircraft. Prior to the formal entry of judgment, SAL IV filed for protection under chapter 11 of the U.S. Bankruptcy Code; SAL IV's only asset was its fifty percent undivided interest in Pinecrest Associates.

¶ 4 On December 22, 1992, Candler filed a complaint against the limited partners of SAL IV seeking to collect its judgment. To avoid further creditor action and to terminate the pending litigation against the individual limited partners of SAL IV, the SAL IV partners decided to assign their interest in Pinecrest Associates to Candler. On March 11, 1993, SAL IV and Candler signed a "Settlement Agreement" assigning SAL IV's interest in Pinecrest Associates to DCM, Candler's assignee, for a $10,000 credit against Candler's bankruptcy claim against SAL IV. The agreement also provided for discounts of twenty-five percent on the individual obligations of the SAL IV limited partners, independent of the assignment of the joint venture interest, if they paid fifty-one percent of the aggregate debt within thirty days. The

assignment of SAL IV's interest in Pinecrest Associates involved only rights to distributions, voting rights, and indemnification; it did not include assumption by DCM of any debts or liabilities associated with the interest.

¶ 5 On April 6, 1993, PIC received a letter from SAL IV informing it of the proposed assignment and settlement agreement, and of a hearing scheduled in the bankruptcy court for approval of the settlement agreement. PIC filed an objection to the proposed settlement agreement, claiming that it did not comply with the requirements of the joint venture agreement and with state partnership law. At the hearing before the bankruptcy court, the settlement was approved. Subsequent to the hearing, PIC gave notice to SAL IV that it intended to exercise its right of first refusal under section 10.2 of the joint venture agreement. In response, DCM claimed that the settlement agreement did not trigger a right of first refusal. Accordingly, on May 21, 1993, PIC informed SAL IV that, if for any reason it was unable to exercise its right of first refusal under section 10.2, it intended to purchase the interest SAL IV was attempting to assign to DCM under the default provision of section 9 of the joint venture agreement. Nevertheless, the joint venture continued to operate, and on February 6, 1996, DCM filed this lawsuit seeking recognition as a full joint venture partner. PIC filed a counterclaim seeking declaratory relief on its claim to a right of first refusal. Eventually, PIC filed a motion for partial summary judgment, which was granted on January 29, 1999. The district court held that the written instrument transferring SAL IV's interest to DCM was in contravention of the joint venture agreement and that PIC was entitled to exercise its right of first refusal. Pursuant to a motion for judgment establishing the amount to be paid by PIC to Candler for the interest in the joint venture, an order was entered on August 12, 1999 finding that the value of the interest in the joint venture was $36,102.

## STANDARD OF REVIEW

¶ 6 This case comes before the court after the district court granted sum-

mary judgment in favor of PIC. "In reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Dixon v. Pro Image, Inc.*, 1999 UT 89, ¶ 12, 987 P.2d 48. In addition, we give the trial court's legal decisions no deference, reviewing them for correctness. *Dairy Prod. Servs. Inc. v. City of Wellsville*, 2000 UT 81, ¶ 15, 13 P.3d 581.

## ANALYSIS

¶ 7 Before us are the following issues: (1) what provisions of the joint venture agreement between SAL IV and PIC were triggered by the settlement agreement between SAL IV and Candler; (2) did the settlement agreement between SAL IV and Candler constitute a bona fide offer to purchase within the meaning of the joint venture agreement; and (3) did the trial court err in its assessment of the value of SAL IV's joint venture interest at $36,102 instead of $62,771.

¶ 8 The joint venture agreement between PIC and SAL IV established numerous events of default which in turn triggered various rights by the non-defaulting party. Included among the events of default were two separate provisions for bankruptcy and for the assignment of a venturer's interest to creditors. Section 9 of the joint venture agreement describes these events of default as follows:

> (a) The attempt by any Venturer to sell, transfer, assign, pledge, hypothecate or otherwise dispose of its interest in the Venture in violation of the provisions of Part X below.
>
> . . . .
>
> (d) If any Venturer shall file a voluntary case in bankruptcy or shall be adjudicated a bankrupt or insolvent. . . .

Under the agreement, any event of default triggered a remedy whereby the non-defaulting venturer could elect either to purchase the interest of the defaulting venturer, to dissolve the joint venture, or to waive both options and allow the venture to continue. In addition, the purchase price of the interest was specified as either a price agreed to by the parties, or the fair market value of the interest as determined by a committee of appraisers.

¶ 9 In September 1992, SAL IV informed PIC of its voluntary filing for bankruptcy. This act triggered PIC's right under the joint venture agreement to either purchase SAL IV's interest or dissolve the joint venture. PIC's failure to choose either option resulted in waiver of its contractual right to select an option. Subsequently, SAL IV entered into negotiations with Candler to assign its interest in Pinecrest Associates to Candler to satisfy a portion of the judgment against it. When Candler and SAL IV executed a settlement agreement regarding the transfer of SAL IV's interest in Pinecrest Associates, a second event of default under the joint venture agreement was triggered.

¶ 10 The second event of default renewed PIC's options to elect to purchase SAL IV's interest in the joint venture, to dissolve the joint venture, or to allow the venture to continue. PIC argues, and we agree, that the settlement agreement between SAL IV and Candler was a bona fide offer to purchase SAL IV's interest; thereby triggering different purchase options under the joint venture agreement based on the actions of the joint venture. In particular, section 15.9 of the joint venture agreement provided that "[t]he rights and remedies of any of the venturers hereunder shall not be mutually exclusive, and the exercise of one or more of the provisions of this Agreement shall not preclude the exercise of any other provisions."

¶ 11 Under the plain language of section 15.9, PIC could elect to purchase SAL IV's interest at a price determined in a manner specified under section 9.3, or under section 10.2, which gave each venturer a right of first refusal in instances of a bona fide offer by a third party.

¶ 12 Because there appears to be no definitive statement in Utah law on the matter, we offer the following guidelines for determining the existence of a bona fide offer. In *Ellis v. Mobil Oil*, 969 F.2d 784, 788 (9th Cir.1992), the court stated that "the facts of each case will set the terms of what constitutes a bona fide offer." A bona fide offer is one made in good faith which, on

acceptance, would be a valid and binding contract. *See Jones v. Riley,* 471 S.W.2d 650, 659 (Tex.App.1971). For an offer to be one that would create a valid and binding contract, its terms must be definite and unambiguous. *See Kipnis v. Mandel Metals, Inc.,* 318 Ill.App.3d 498, 251 Ill.Dec. 855, 741 N.E.2d 1033, 1037 (2000).

¶ 13 Other factors may assist the court in determining the bona fides of an offer, including (1) the relationship of the parties (e.g., whether the parties have competing interests), (2) whether the transaction was made under duress, (3) whether the transaction occurred in the open market, (4) whether the offer approximates fair market value, and (5) whether there are any elements of fraud or misrepresentation involved. No one of the foregoing factors is dispositive, and courts must consider the transaction as a whole. As stated in *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 663 (1982), the purpose of requiring a bona fide offer is to protect against sham offers not made in good faith, which would otherwise precipitate the exercise of preemptive rights.

¶ 14 Applying the foregoing factors to the settlement agreement between SAL IV and Candler, we conclude that the settlement agreement constituted a bona fide offer that triggered PIC's right of first refusal under the joint venture agreement. Acceptance and ratification of the settlement agreement by the bankruptcy court are themselves strong indications of the valid and binding nature of the offer and its good faith. Additionally, the settlement agreement was an integrated contract to transfer SAL IV's interest in PIC to Candler in exchange for a reduction in SAL IV's indebtedness to Candler. In section 5(d), the settlement agreement states:

> This Agreement contains the entire agreement between the parties with respect to the subject matter of this Agreement, and it supersedes all prior negotiations, agreements, correspondence, and discussions between the parties. There are no representations, warranties, understandings, or agreements other than those expressly set forth herein.

Thus, the settlement agreement established definite and certain terms as to what was accepted by SAL IV in exchange for its interest—namely a reduction of $10,000 in Candler's judgment against SAL IV, plus an offer of discounts of twenty-five percent on each individual partner's portion of the judgment in return for payment of a certain amount within thirty days. Candler and SAL IV had competing interests in establishing the value of the interest transferred in the settlement agreement. Candler's incentive was to pay the lowest price possible for the joint venture interest, thereby retaining his ability to collect more money on his judgment from the limited partners. SAL IV's incentive was to get the maximum value for its interest in order to extinguish the judgment and protect its limited partners. The settlement agreement states that the fair market value of SAL IV's interest in Pinecrest Associates is $10,000. Although DCM argues that this value was in fact considerably below fair market value and that the settlement agreement should therefore not be considered a bona fide offer, we find the competing interests of SAL IV and Candler in the settlement negotiations, together with the unqualified representations made to the bankruptcy court, to be dispositive of the question.

¶ 15 Having determined that the settlement agreement constituted a bona fide offer to purchase SAL IV's interest in PIC, we now address the value of Candler's interest for purposes of PIC's right of first refusal. In the court below, the parties stipulated that three possible figures represented the amount paid by Candler for SAL IV's interest in the joint venture:

1. $10,000 as stated in the settlement agreement as the "fair market value" of SAL IV's interest, which was also the corresponding reduction in Candler's bankruptcy claim against SAL IV.

2. $36,102 equaling the $10,000 reduction in Candler's claim against SAL IV plus the sum of the discounts actually given by Candler to those limited partners who paid within the thirty days.

3. $62,771 comprising the $10,000 reduction and all discounts offered by Candler to

the partners of SAL IV, regardless of acceptance.

¶ 16 In determining the consideration paid by Candler for the interest, we look at the actual value agreed to in the contract. Following established principles of contract law, we conclude that the settlement agreement contained two independent provisions. First, SAL IV agreed to transfer its interest in Pinecrest Associates to Candler for a $10,000 reduction in Candler's claim against SAL IV. The second provision contained an independent promise by Candler to give a twenty-five percent discount to each limited partner on his or her individual indebtedness, provided that fifty-one percent of the entire bankruptcy claim was paid within thirty days. In addition, in section 3(c) of the settlement agreement, Candler preserved its right to pursue collection of the full amount against the limited partners if less than fifty-one percent of the aggregate sum was paid within thirty days. Section 3(a) also provided that "[t]he collection of less than 51% will not affect the assignment under paragraph 2 above." This language plainly indicates the independent nature of the two provisions. Candler was entitled to the transfer of SAL IV's interest in the joint venture in return for his $10,000 offset, regardless of the participation or nonparticipation of the limited partners. Thus, the district court would have been justified in valuing the interest at $10,000. However, the court afforded Candler the benefit of the discounts actually provided to the joint partners, and determined that SAL IV's interest in Pinecrest Associates was worth $36,102. Because PIC failed to file a cross-appeal on that question, we affirm the district court's holding. In order for PIC to exercise its right of first refusal under the joint venture agreement, it must comply with the terms of the transfer of the joint venture interest provision of the settlement agreement, namely payment of $36,102.

## CONCLUSION

¶ 17 We affirm the district court's holding that PIC is entitled to exercise its contractual right of first refusal vis-a-vis the bona fide offer of purchase contained in the settlement agreement between SAL IV and DCM. DCM is entitled to reimbursement for the amount it paid in the settlement for SAL IV's joint venture interest. We likewise affirm the court's assessment of $36,102 as the value of the interest.

¶ 18 Justice DURRANT and Justice WILKINS concur in Justice DURHAM's opinion.

Chief Justice HOWE, concurring:

¶ 19 I concur except I do not join the majority's pronouncement that the trial court "would have been justified" in valuing the interest of SAL IV at $10,000. That issue has not been raised by the parties on appeal and has not been briefed. Under well accepted rules of appellate review, this issue should not be raised sua sponte by the court and decided without briefing and argument by the parties. I therefore express no opinion on that issue.

¶ 20 Associate Chief Justice RUSSON concurs in Chief Justice HOWE's concurring opinion.